ROBERT H. THAYER and VIRGINIA THAYER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Thayer v. Commissioner
Docket No. 7625-74.
United States Tax Court
T.C. Memo 1977-370; 1977 Tax Ct. Memo LEXIS 72; 36 T.C.M. (CCH) 1504; T.C.M. (RIA) 770370; October 25, 1977, Filed; As Amended December 12, 1977 *72 Value of open-space or scenic easement over a 60-acre country gentleman's estate on the Potomac River donated in gross and in perpetuity to a charitable organization determined. John B. Jones, Jr., and Michael R. Levy, for the petitioners. Frank *73 J. Coyne, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined a deficiency in petitioners' income tax for the taxable year ended December 31, 1970, in the amount of $5,331.34. The single issue presented for decision is: What was the fair market value on January 30, 1969, of an open-space or scenic easement over Overlook Farm that petitioner Virginia Thayer donated to the Virginia Outdoors Foundation? [1]
FINDINGS OF FACT Some facts have been stipulated and are found accordingly. The stipulation of facts and joint exhibits are incorporated herein by this reference. Petitioners are husband and wife whose legal residence at the time of filing their petition was in Washington, D.C. For the calendar years 1969 and 1970, petitioners filed joint Federal income tax returns with the district director, Internal Revenue Service, Manhattan, N.Y.
Since 1955 petitioner Virginia Thayer has owned the tract of land known as Overlook Farm located *74 at 10711 Gunston Road, Lorton, Fairfax County, Va., about 19 miles south of Washington, D.C. Overlook Farm consists of 59.327 acres of land lying generally between the Gunston Hall Plantation and the Potomac River on the Mason Neck peninsula. As of 1969, Overlook Farm included the following improvements: A large two-story masonry and frame house containing 10 rooms and 3-1/2 baths; a swimming pool with bathhouse; a terraced formal garden; a boathouse and dock; a frame dwelling with 2 rooms and a bath (maid's cottage); a frame dwelling with 6 rooms and 2 baths (caretaker's cottage); and other assorted structures including a garage, two barns, a pheasant house, and a toolshed. Two sections of the property are cleared as pasture land, but substantial portions of the land remain wooded. Overlook Farm originally was part of the George Mason estate now known as the Gunston Hall Plantation and is a choice location. Overlook Farm, once known as Benevenne, was separated from Gunston Hall by deed dated August 6, 1872. The property is bounded by the Gunston Hall property by land and Gunston Cove of the Potomac River, which affords it seclusion, and it enjoys a magnificent vista over the *75 Potomac. As such, the property offered a uniquely desirable location for homesites, if the land could have been developed. Gunston Hall and Overlook Farm are located on the easterly tip of Mason Neck, which is a promontory surrounded by Pohick Bay, Gunston Cove, and the Potomac River on its easterly side, by the Potomac on the south, and by Occoquan Bay and Belmont Bay on its westerly side. It extends about 5 to 6 miles to the east and south of U.S. Route 1, which runs between Washington, D.C. and Richmond, Va. Access to the outer part of the peninsula is by way of Gunston Hall Road, a paved, two-lane road running from Route 1 to Gunston Hall. There is very little commercial activity on the outer peninsula, except for several subdivisions located on the extreme southeasterly tip, which are several miles from Overlook Farm. The Gunston Hall property which surrounds Overlook on the land side contains about 556 acres. The central part of Overlook Farm, on which is located the manor house and other improvements, is a plateau, which is approached by a narrow, unpaved road leading from the paved road at the entrance to Gunston Hall to the westerly boundary of the property and thence *76 across the property to the manor house. That portion of the property lying to the right of the access road is cleared for the most part and is a sloping, benched, open field. The open field extends around the front of the house, which is on the highest point and looks out on the river. Also included in the property is some wooded land, part of which is rather steep, extending to the south of the open fields. To the left of the access road is for the most part uncleared, wooded land which is rather flat for some distance and then starts to drop off. There is one flat, cleared area in this location which is used as a garden. The land on the east and south of the open, flat plateau area on which the house and other improvements are located drops off very steeply to the water. Thus, the manor house is located on a bluff overlooking the river with a large sloping open field in front, and a rather larger flat, open area to the rear containing the driveways leading to the house. The manor house itself is not pretentious and was not designed for grandeur. The only vehicular access to Overlook is by way of the narrow dirt road mentioned above extending from the paved road at Gunston *77 Hall along a 15-foot right-of-way across Gunston property a distance of 1,576 feet to the westerly line of the Overlook property, and continuing across Overlook property to the manor house. The presently usable part of the right-of-way is about 7 to 8 feet wide with drainage ditches along both sides. It would be virtually impossible for two automobiles to pass each other along this quarter mile stretch in its present condition without one of them having to run over the drainage ditch on one side. There is adequate flat land on either side of the road after it reaches the Overlook property line to widen the road across the property. Overlook does not have access to public water and sewage facilities. Its sewage is disposed of by use of a septic tank located in a drainage field down the hill to the right of the manor house. Approximately 11 acres of the land is fairly level consisting of fine sandy loam which would support footers for single-family dwellings and can accommodate drainage fields for septic tanks. The rest of it is hilly, too steep, and contains gravelly sediment at or near the surface; parts of it are subject to surface sliding and erosion. Due to its composition *78 and topography this part of the property is rated as marginal, too poor for septic tank drainage fields. There are two or three areas, in addition to the present drainage field, that would accommodate drainage for septic tanks. Most of the property surrounding Gunston Hall and Overlook Farm that has changed hands in years immediately prior to and subsequent to 1969 has been acquired by the Virginia Outdoors Foundation or other agencies of the State and Federal government interested in conservation and preservation of natural beauty. Efforts of several land developers to have areas of the southwesterly part of Mason Neck rezoned to accommodate mutiple single-family subdivisions have been rebuffed. Throughout the year 1969, Overlook Farm was classified as RE-2 under the applicable Fairfax County zoning ordinance. This classification permits all agricultural uses. With respect to minimum lot sizes, the regulation provides all lots other than in approved subdivisions must have a minimum area of 2 acres. In approved subdivisions, lot areas must have an average of 2 acres, and the minimum lot area must be 80,000 square feet. By deed dated January 30, 1969, petitioner Virginia *79 Thayer conveyed to the Virginia Outdoors Foundation an open-space or scenic easement in gross over, and the right in perpetuity to restrict the use of, Overlook Farm. The Virginia Outdoors Foundation is an organization described in section 170(c)(2), I.R.C. 1954. [2] The deed stated the grantor's desire was to preserve her property, which was adjacent to historic Gunston Hall owned by the State of Virginia, for the future benefit and preservation of Gunston Hall. The restrictions imposed on the use of the property, which the grantee is entitled to enforce, include in brief: 1. No industrial or commercial activities.
2. No building shall be built or maintained on the property except farm buildings and one single-family dwelling with customary outhouses. 3. No signs or outdoor advertising. 4. No dumping of rubbish. 5. Only selective culling of timber. 6. The property shall not be subdivided. The principal effect of the easement was to prevent any further development of the property other *80 than as a farm. The easement particularly prohibits subdividing. Simply stated, petitioner gave away the right to develop the property. The conveyance of the open-space easement by petitioner qualified under section 170(c) as a charitiable contribution to the Virginia Outdoors Foundation. On their Federal income tax returns for 1969, petitioners reported the value of the donated easement as $146,000 and deducted that amount as a charitable contribution. Respondent determined that the value of the easement was $60,000.The deficiency determined by respondent results from a reduction in the carryover for charitable contributions from 1969 to 1970. The parties agree that the only matter in dispute is the fair market value on January 30, 1969, of the easement donated to the Virginia Outdoors Foundation. Petitioners contend that the fair market value at the time was $147,688; respondent argues that the fair market value was $60,000. To establish the proper fair market value for the open-space easement, petitioners and respondent each presented the testimony of an expert witness, Fred C. Forberg for petitioners, and George P. Scussel for respondent. Petitioner's expert witness, *81 Fred C. Forberg of Richmond, Va., is the director of the Division of Real Estate Appraisal and Mapping of the Virginia Department of Taxation. From his 30 years of experience appraising real estate in Virginia, Forberg is familiar with real estate throughout Virginia and specifically in Fairfax County. He personally appraised all nine or ten prior open-space easements his department had been asked to make. These appraisals were for the Virginia Outdoors Foundation and the Virginia Historic Landmarks Foundation, two agencies set up to receive open-space easements for the Commonwealth of Virginia. Forberg appraised the subject easement in June 1972. His department only appraised properties at the request of another State agency (not at the request of a private citizen), and this appraisal was made in response to a request by Marvin Sutherland, the director of the Virginia Division of Conservation and Economic Development. Thus Forberg appraised the easement in conjunction with his official duties, without compensation by petitioners. However, in a one-page letter dated June 30, 1972, addressed to petitioner Robert H. Thayer, Forberg valued the easement at $147,688. This was *82 derived by comparing the value of Overlook Farm before ($347,005) and after ($199,317) the easement. Prior to the conveyance, Forberg's letter said the land had a value of $5,000 an acre ($296,635), and the buildings and improvements added $50,370. After the easement, according to Forberg's letter, the land value was reduced to $104,327, and the buildings had a value of $94,990. Forberg filled in the details of his appraisal from the witness stand at trial but did not file a written appraisal report. Respondent's expert witness, George P. Scussel of Arlington, Va., is a real estate appraiser with the Internal Revenue Service in Washington, D.C. He has 20 years' appraisal experience with the Service, the Corps of Engineers, and the State Road Department of Florida. He has appraised urban and rural properties and various easements, including scenic easements. He also has appraised real estate for the purpose of right-of-way acquisition and holds a senior member designation with the American Right-of-Way Association. Scussel examined Overlook Farm on September 23 and 24, 1975, and supported his testimony with a formal written report of his appraisal dated January 6, 1976. Scussel *83 valued the easement at $60,000, based on a preeasement value for Overlook Farm of $300,000 (rounded) and a post-easement value of $240,000 (rounded). William F. Sledjeski, a soil scientist for Soil Consultant's Inc., conducted a soil study of Overlook Farm for petitioner and made a report dated March 23, 1976. The purpose of the study was to determine the potential for on-site sewage disposal systems in accordance with the 1969 standards of the Fairfax County Health Department. Sledjeski's conclusion was that there were two and possibly three potential septic tank drain-field sites within a single area about 250' x 150' near the south-central part of Overlook Farm. Additional investigations were made in the upland portions of the property. The soils there were found to have moderate limitations for septic tank drain fields. Individual potential sites were not located due to the "cursory" nature of the study. Detailed studies including actual water tests at various depths would be necessary to determine the absolute suitability of individual sites. According to Sledjeski, possibly one or two drain-field sites may be located at the highest elevations following detailed soil *84 and percolation tests. Sledjeski also noted that the septic tank drain field for the existing residence, in another area of the property, has limitations for use as septic tank drain fields, but the system appeared to be functioning adequately during the study period. Other areas of Overlook Farm apparently were not tested. The Fairfax County tax assessor valued Overlook Farm in 1970 for ad valorem real estate taxes. The tax assessor made two assessments. For the original assessment, the scenic easement grant was overlooked. The corrected assessment took into consideration the easement. The assessed valuations were as follows: Land
Improvements
Assessed Value
Original
$47,460
$26,935
$74,395
Corrected
30,865
31,395
62,260
ULTIMATE FINDING OF FACT The fair market value on January 30, 1969, of the open-space easement over Overlook Farm that petitioner Virginia Thayer donated to the Virginia Outdoors Foundation was $113,000. OPINION The only issue in this case is what the fair market value was on January 30, 1969, of an open-space or scenic easement over Overlook Farm that petitioner Virginia Thayer donated to the Virginia Outdoors Foundation. *85 The parties are in agreement that the Virginia Outdoors Foundation is an organization described in section 170(c)(2) and that the conveyance qualified as a charitable contribution under section 170(c) and section 1.170A-7(b)(1)(ii), Income Tax Regs.[3] What the parties dispute is the fair market value of the easement.Petitioners argue that the fair market value at the time was $147,688; respondent contends that the fair market value was $60,000. Pursuant to section 1.170-1(c)(1), Income Tax Regs., if a contribution is made in property other than money, the amount of the deduction is determined by the fair market value of the property *86 at the time of the contribution. The fair market value, according to the regulations, is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. No established market existed to which one might refer directly to determine the fair market value of the easement. Instead, each party valued the easement by reference to Overlook Farm's loss in value on account of the easement. More precisely, this procedure entails measuring the difference between the fair market value of Overlook Farm immediately before the easement was granted and the fair market value of the property immediately after the easement was granted. This valuation procedure involves traditional real estate valuation principles, except it is necessary to derive two valuations rather than one. Any decline in Overlook Farm's fair market value as a result of the easement represents the fair market value of the easement itself. This "before and after approach" was approved by respondent where there are no sales to use as comparables in Rev. Rul 73-339, 1973-2 C.B. 68. *87 Both experts used this approach. Both parties offered the testimony of a well qualified real estate appraisal expert in support of their valuations. Petitioners' expert, Forberg, had had a great deal of experience in valuing real estate in Virginia and was undoubtedly more familiar with the attributes and deficiencies in the land on Mason Neck and with comparable lands in Virginia than was respondent's expert, Scussel. Forberg had also had considerable experience in valuing scenic easements for the State of Virginia. However, since Forberg was valuing this easement at the request of the Virginia Division of Conservation and Economic Development as a part of his official duties and was not employed by petitioners to make an appraisal, he did not prepare a written appraisal report; so the details of his appraisal approach are a little hard to follow. We also doubt that Forberg went through all of the detailed appraisal procedures that Scussel did to arrive at his before and after values; we feel that he relied to some extent on his general knowledge of subject and surrounding properties in determining the highest and best use of Overlook Farm before and after the easement and the *88 values to be assigned thereto. Respondent's expert witness, Scussel, had also had many years of experience appraising real estate, rights-of-ways, and to some extent scenic easements, in Virginia and surrounding States.While he may not have had as much experience in appraising scenic easements as had Forberg, we do not believe this would make much difference since the method of valuing the scenic easement used by both experts here was to determine the difference in value of the property before and after the easement, using conventional real estate appraisal approaches. And while Scussel was probably not as familiar with properties on Mason Neck as was Forberg, we believe Scussel made a greater effort to find comparable properties in the surrounding areas that had been sold near the time of the valuation date and that he made a more detailed analysis of the attributes and deficiencies of Overlook Farm as compared to other properties used as comparables than did Forberg. In short, we believe both experts were eminently well qualified and we have utilized the opinions of both in arriving at our conclusion. The main disagreement between the two experts and between petitioners and *89 respondent is over what the highest and best use of Overlook Farm was before the easement was granted. They agree that the highest and best use of the property after the easement was granted was as a country gentleman's estate. Forberg concluded that the most profitable, likely, and legal use for Overlook before the easement was to develop it into five to eight luxury homesites. [4] Scussel concluded that the lack of adequate access, the lack of adequate water and sewage facilities, the zoning requirement of 2-acre lots coupled with the location of the manor house and the topography of the other land, and the resistence of conservation groups and neighbors to further development of Overlook Farm would make use of the land for even five to eight additional homesites economically unfeasible and that the highest and best use for the property both before and after the easement was for a country gentleman's estate, for which it is presently being used. Scussel did recognize, however, that the restrictions contained in the easement would diminish the value of the property as a country gentleman's estate; hence, his value of $60,000 on the easement.
*90 We must agree with Forberg that the highest and best use of the property before the easement was for several luxury homesites in addition to the manor house, and that were it not for the zoning requirements, the access problem, and the inadequate water and sewage facilities the property could have been subdivided and sold for numerous single-family dwellings. The writer, accompanied by counsel for both parties, visited the property and walked all of the cleared property and parts of the uncleared land. It is a beautiful site with magnificent views of Gunston Cove and the Potomac River from many vantage points. The hilly topography of the cleared portion of the land, as well as parts of the wooded land, would lend itself readily to numerous single-family dwellings were it not for the limitations mentioned above. We cannot conceive, however, that such use of this property would ever be likely to occur, without the easement, because of the desires of the present owners and the resistance of the State of Virginia and other neighbors. However, the deficiencies mentioned above are more real than imaginary, and we are of the opinion that it would not have been physically or economically *91 feasible to attempt to induce more than two to four additional luxury homesites onto the property. The access road would be a real problem. While it might be improved within the 15-foot right-of-way to such an extent that two automobiles could pass, we doubt that as a practical matter it would accommodate more than one auto at a time, and there is a curve in the right-of-way that makes visibility from one end to the other impossible. And it is highly unlikely that the owners of the Gunston Hall property would grant a greater easement for development purposes. We have no expertise in soil characteristics and must determine as best we can from the testimony of the experts just how many homes could be served for sewage purposes by the available drainage field sites. The evidence we received on this subject was rather general, and it is impossible to determine with any certainty whether any of the two or three drainage sites would serve more than one homesite.When coupled with the zoning requirement of 2-acre lots and the hilly terrain we rather doubt that more than two to four homesites could be accommodated with acceptable sewage disposal. And we also have strong doubts that the *92 property could have been rezoned for higher density occupation.
Having concluded that the highest and best use the property could have been used for prior to the easement was for the development of two to four additional luxury homesites, we must determine the value of the property for that purpose prior to the easement. Since Scussel concluded that the property could not be used for that purpose, we have no direct evidence from him as to its value for such purpose. Forberg felt that because of the unique location and qualities of Overlook Farm there were no comparables in the Mason Neck area that would be useful in valuing Overlook Farm. He therefore relied on what he had found out about property values through his associates at the courthouse in Fairfax County as well as the knowledge he had of property values in the State, and upon his judgment of what a developer would pay for choice land of this type. He thought the properties most nearly resembling Overlook Farm in its most valuable respect, waterfront, were two properties located 50 to 90 miles down the river in different counties. We cannot give much weight to the prices paid for those properties because of the difference *93 in location and other physical characteristics. For example, one of them was in a subdivision which undoubtedly had better access and sewage facilities. On the other hand, Forberg did refer to condemnation awards for two properties on the waterfront on Mason Neck that were similar to Overlook Farm which exceeded $5,000 per acre. But since these were condemnation awards which are seldom used for appraisal purposes and were made in 1973 and 1974, Forberg did not use these awards in his appraisal and neither can we. Scussel's examination of sales of land on Mason Neck indicated that none of the properties had been sold for as much as $5,000 per acre. Since a good part of the acreage in the Overlook tract was quite steep or otherwise unavailable for homesites, we believe Forberg's pre-easement valuation of the land at $5,000 per acre was high. If we are correct in concluding that Overlook could accommodate fewer than the five to eight additional homesites Forberg had in mind, the economics of using the land for fewer homesites would also have a depressing effect on the value of the land for that purpose. Forberg believed that maintenance of only the manor house was consistent with *94 the development of the land into homesites, so he assigned no value to the other improvements such as the swimming pool, barns, etc., in his preeasement appraisal and added only $50,370 for the manor house to the value of the land.Scussel added to his value of the land the sum of $115,651 as the value of the house and improvements both before and after the easement. Forberg added $94,990 as the value of the house and improvements after the easement when it was clear that the other improvements would remain intact. Since we do not believe the division of the property to provide two to four additional luxury homesites would have been undertaken in such a manner as to interfere with the use of the manor house with most of its improvements, we conclude that the value of the improvements should be taken into consideration in arriving at a pre-easement valuation of the property. Thus, the value assigned to the improvements, being the same before and after, would make no difference in the equation used to determine the value of the easement, so we have used an arbitrary figure in between the two figures given us by the experts in arriving at a value for the manor house and other improvements, *95 both before and after the granting of the easement. Based on the evidence presented and taking all factors into consideration in light of the discussion above we conclude that the fair market value of Overlook Farm before the easement was granted was $342,500. The parties agree that the highest and best post-easement use of Overlook Farm was as a country gentleman's estate. Forberg valued the property for this purpose at $199,317, using a land value of slightly in excess of $1,750 per acre and $94,990 as the value of the improvements. Why Forberg regarded the Overlook Farm land as so much less valuable than other Mason Neck properties (sold at $2,300 per acre) that also could not be developed at that time (but might have been in the future) is not clear in light of his view that Overlook Farm's panoramic view was so unique. Despite the fact that he believed that the highest and best use of the land was not changed by the easement, Scussel did recognize that the limitations imposed by the easement did diminish the value of the land as a country gentleman's estate. Factors that he took into consideration were the limitation on use of the property to farm purposes, restrictions *96 on its use for certain commercial or industrial purposes, limitations on constructing additional buildings, provisions with respect to signs, trash, and forestry, and the fact that subdividing was restricted in perpetuity even though conditions might change in the future. In his opinion these provisions in the easement diminished the value of the land from about $3,100 per acre to $2,100 per acre. Given his belief that the highest and best use of the property did not change, his appraisal of the decline in value as a result of the easement appears generous. Scussel found that the fair market value of the land after the easement was $2,100 per acre, or $124,586, to which he added the same $115,651 as the value of the improvements, for a total post-easement value of $240,000. Using our best judgment based on the experts' appraisals and other facts of record, we find that the fair market value of Overlook Farm after the easement was $229,500. Using the "before and after" approach to value the easement we conclude that the fair market value on January 30, 1969, of the open-space or scenic easement over Overlook Farm that petitioner donated to the Virginia Outdoors Foundation was *97 $113,000. Decision will be entered under Rule 155. Footnotes
1. This issue is relevant to the taxable year 1970 which is before us because of a claimed carryover of a charitable contribution deduction from the year 1969.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect in the year in issue, unless otherwise specified.↩
3. Under sec. 1.170A-7(b)(1)(ii), Income Tax Regs., a charitable contribution of an open-space easement in gross in perpetuity is considered a contribution of an undivided interest in property to which the sec. 170(f)(3)(A)↩ limitation for partial interests in property does not apply.
4. See Estate of Hall v. Commissioner,T.C. Memo. 1975-141↩, for this definition of highest and best use.