**TAX COURT OF NEW JERSEY**



JOSHUA D. NOVIN
Judge

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS**

June 7, 2024

Robert D. Blau, Esq.
Blau & Blau
223 Mountain Avenue
Springfield, New Jersey 07081

Lawrence P. Cohen, Esq.
Lavery, Selvaggi & Cohen, P.C.
1001 Route 517
Hackettstown, New Jersey 07840

Fred Semrau, Esq.
Robert J. Rossmeissl, Esq.
Dorsey & Semrau, LLC
P.O. Box 228
Boonton, New Jersey 07005

> Re:  City of Newark/City of Newark-Div. Sewer and Water
> v. West Milford Township
> Docket Nos. 015734-2014, 006894-2015, 005070-2016, 007402-2018,
> 005841-2018, 006935-2019,[1] 008282-2019, 008756-2020, 011966-2020,
> 003283-2021, and 003338-2021

Dear Mr. Blau, Mr. Cohen, Mr. Semrau, and Mr. Rossmeissl:

This letter constitutes the court's opinion following trial in the above-referenced matters. These matters involve challenges to the local property tax assessments on one hundred and seventeen parcels, comprising approximately 16,485 acres of wooded and unimproved watershed property in West Milford Township, Passaic County, New Jersey.

For the reasons stated more fully below, the court affirms the 2014, 2015, 2016, 2018, 2019, 2020, and 2021 local property tax assessments.

---

[1] West Milford's 2019 Case Information Statement misidentified three properties that did not exist on its tax roll: (i) Block 10,001, Lot 24; (ii) Block 13,300, Lot 3; and (iii) Block 56,300, Lot 14605. Based upon the evidence presented, the court finds that: (i) Block 10,001, Lot 24, should be amended to Block 00101, Lot 24; (ii) Block 13,300, Lot 3, should be amended to Block 16906, Lot 3; and (iii) Block 56,300, Lot 14605, should be amended to Block 14605, Lot 8. Thus, under R. 4:9-2, the court hereby amends West Milford's 2019 pleadings to conform to the evidence.

## I.     Procedural History and Factual Findings

The City of Newark/City of Newark-Division of Sewer and Water ("Newark") is the owner of one hundred and seventeen parcels, comprising approximately 16,485 acres of unimproved real property (the "subject property"), in West Milford Township ("West Milford"), Passaic County, New Jersey.  The subject property was acquired by Newark in the early 1900's and comprises a portion of Newark's watershed.  The entire Newark watershed comprises approximately 35,000 acres of land in northern New Jersey maintained as a buffer for the protection and preservation of Newark's water supply ("Newark's watershed").[2]

The subject property is remote, heavily forested land with numerous parcels having limited road access, and a topography that ranges from flat areas to steep mountain slopes with rock outcroppings.  It includes Echo Lake, Clinton Reservoir, and portions of Canistear Reservoir.  The property contains habitat that supports several endangered, threatened, and declining wildlife species, including migratory birds.[3]  Portions of the subject property border New Jersey's Wawayanda State Park[4] and the Apshawa Preserve.[5]

---

[2]  Newark's watershed comprises "five major bodies of water . . . in Vernon and Hardyston in Sussex County, Jefferson, Rockaway and Kinnelon in Morris County, and West Milford in Passaic County."  City of Newark v. Vernon Twp., 1 N.J. Tax 90, 92 (Tax 1980).

[3]  During trial, Newark's valuation expert (as such term is defined herein) testified that the subject property includes Echo Lake and Clinton Reservoir.  However, Newark's valuation expert's appraisal report states that the subject property also includes "portions of Canistear Reservoir."

[4]  New Jersey's Wawayanda State Park consists of approximately 34,350 acres of unimproved land that surrounds Lake Wawayanda offering more than sixty miles of public trails, picnic areas, swimming, camping, boating, fishing, and hunting recreational activities.  See https://nj.gov/dep/parksandforests/parks/wawayandastatepark.html.

[5]  The Apshawa Preserve is a 576-acre preserve offering more than five miles of trails for hiking, bicycling, horseback riding, nature study, and fishing.  The Preserve is a cooperative project of the New Jersey Conservation Foundation and Passaic County.  See https://www.njconservation.org/preserve/apshawa-preserve/.






As of each valuation date, the subject property's local property tax assessment, total implied equalized value, and implied equalized value, per acre, are set forth below:

| Valuation date | Total tax assessment[6] | Average ratio of assessed to true value | Total implied equalized value | Implied equalized value, per acre |
|---|---|---|---|---|
| 10/1/2013 | $35,820,050 | 92.92% | $38,549,344 | $2,338 |
| 10/1/2014 | $35,820,050 | 95.27% | $37,598,457 | $2,281 |
| 10/1/2015 | $35,820,050 | 90.34% | $39,650,266 | $2,405 |
| 10/1/2017 | $39,138,250 | 91.95% | $42,564,709 | $2,582 |
| 10/1/2018 | $39,138,250 | 90.68% | $43,160,840 | $2,618 |
| 10/1/2019 | $43,263,400 | 87.38% | $49,511,788 | $3,003 |
| 10/1/2020 | $43,263,400 | 86.74% | $49,877,104 | $3,026 |

Newark timely filed appeals contesting the subject property's 2014, 2015, 2016, 2018, 2019, 2020, and 2021 tax year assessments.[7] West Milford timely filed counterclaims for the 2014, 2015, 2016, 2018, 2019, 2020, and 2021 tax years. In addition, for the 2018 and 2019 tax years, West Milford timely filed separate complaints seeking to raise the subject property's tax assessments.[8]

Prior to the commencement of trial, Newark and West Milford stipulated several issues.[9]

---

[6] Set forth under the Stipulations for Trial filed July 12, 2023 (the "Stipulations for Trial").

[7] For the 2014, 2015, and 2016 tax years Newark filed appeals contesting the tax assessments on one hundred and twelve parcels. However, according to the parties' Stipulations for Trial, the total acreage remained fixed at 16,485-acres.

[8] For the 2014 tax year, West Milford initially filed tax appeals with the Passaic County Board of Taxation seeking to raise the subject property's tax assessments. On September 19, 2014, the Passaic County Board of Taxation entered judgments increasing the subject property's 2014 tax year assessments under judgment code "1E" with the notation "Assessor Rec." Newark subsequently filed complaints with the Tax Court challenging the judgments of the Passaic County Board of Taxation. For the 2015, 2016, 2018, 2019, 2020, and 2021 tax year, direct appeal complaints were filed with the Tax Court

[9] The Stipulations for Trial: (i) identified the one hundred and seventeen (117) parcels and recited the acreage and annual assessed value of each parcel; (ii) stipulated that "the valuation that will be placed on the properties by the [c]ourt will be determined on a per acre valuation . . . and that the number of acres of each parcel will be multiplied by that value in order to determine the total






Trial was conducted over nine days.[10]  During trial, Newark and West Milford each elicited testimony from New Jersey certified general real estate appraisers, who were accepted by the court, as experts in the field of real property valuation (referred to herein as "Newark's valuation expert" and "West Milford's valuation expert").[11]  Each expert prepared an appraisal report containing photographs of the subject property and expressing opinions of the subject property's true or market value as of the October 1, 2013, October 1, 2014, October 1, 2015, October 1, 2017, October 1, 2018, October 1, 2019, and October 1, 2020 valuation dates.[12]

Additionally, during trial West Milford offered testimony from Newark's watershed recreation office manager, from an individual qualified by the court as an expert in the field of land conservation and land preservation, and from West Milford's municipal tax assessor.

---

assessed value of each parcel under appeal"; (iii) stated that "each acre has the same value and that there is no differentiation in value which may be ascribed to location of a particular lot or availability of utilities"; (iv) the subject property is constrained by conservation easements granted "by the City of Newark to the New Jersey Department of Environmental Protection . . . [that] impose the same restrictions on all the properties"; and (iv) Newark and West Milford's appraisers are duly qualified and can offer opinion testimony based on their respective appraisal reports. Following the court reading the Stipulations for Trial into the record, West Milford's counsel represented to the court that there are "three conservation deeds, one I believe does not include West Milford property, one includes a relatively minor portion of the property, the main conservation deed is the one of May of 2006 . . . I think we can agree that the deeds as far as restrictions . . . and we believe the restrictions are, exactly the same."  In response, Newark's counsel stated that "we have been working under the assumption that the restrictions in the conservation deed or easement that was dated 2006, that those restrictions apply to the entire property . . . all I can say is, it is probably correct."

[10]  Eight days were devoted to testimony and one day was devoted to evidentiary matters and scheduling.

[11]  Under the Stipulations for Trial, Newark and West Milford agreed that the appraisers were "qualified" and "can testify based upon their appraisal reports."

[12]  Newark's valuation expert concluded that "there is no legally permissible use that is financially feasible.  Therefore, in my opinion, the subject property does not have a market value."  However, because he was asked to appraise the subject property "using the hypothetical assumption that the sale of [fire]wood is permitted," Newark's valuation expert arrived at an estimated market value for the subject property provided that "the hypothetical assumption is assumed to be true."






The subject property is in West Milford's R-4 low density single family residential zoning district. Permitted uses in the R-4 zoning district include farms, single-family detached dwellings, residential cluster developments, public utilities, community residences for the developmentally disabled, equestrian centers, shooting ranges, bed and breakfast establishments, and wireless telecommunications facilities.

In addition to the zoning ordinance limitations, the subject property is constrained by deeds of conservation easements (as detailed below), the Watershed Protection and Moratorium Act (L. 1988, c. 163, as amended by L. 1990, c. 19) (the "Watershed Protection Act"), and the New Jersey Highlands Water Protection and Planning Act (N.J.S.A. 13:20-1 to -35) (the "Highlands Preservation Act").[13]

### A. Conservation Easements

In consideration for $27,561,662, under Deeds of Conservation Easement dated January 24, 2002, May 8, 2004, and May 31, 2006 (collectively referred to as the "Conservation Easements"),[14] Newark granted the New Jersey Department of Environmental Protection

---

[13] It is unclear from the trial record whether the subject property is impacted by the Freshwater Wetlands Protection Act (N.J.S.A. 13:9B-1 to -30) ("Freshwater Wetlands Act"). Newark's valuation's expert appraisal report states "[t]he subject has a variety of freshwater wetlands; however, the appraisers are not qualified to render a professional opinion as to the presence or extent of freshwater wetlands. The reader is advised to seek competent, professional advice . . . This appraisal assumes that the presence of freshwater wetlands or freshwater buffers does not have an adverse effect on the value of the subject property." West Milford's valuation expert's appraisal report similarly states that "the subject appears to be encumbered by freshwater wetlands," and "[t]he the property contains . . . areas of potential wetlands." However, no meaningful testimony or evidence was offered during trial delineating the impact, if any, of the Freshwater Wetlands Act on the subject property.

[14] The Conservation Easements were granted under the New Jersey Conservation and Historic Preservation Restriction Act, N.J.S.A. 13:8B-1 to -9 (the "New Jersey Conservation and Historic Preservation Restriction Act"). The Deed of Conservation Easement dated January 24, 2002, reflects consideration paid to Newark of nine million nine hundred thirty-three eight hundred






("NJDEP"), conservation easements on the subject property.[15]   Under the Conservation Easements, Newark agreed that the subject "[p]roperty will be retained forever and predominantly in its natural forested condition," and that the following uses shall be forever prohibited:

> Subdivision and Development.   Any new development or subdivision of the Property is expressly prohibited, except for specific rights retained in this Easement.

> Structures. Construction of billboards and cellular phone towers, golf courses, airstrips, and helicopter pads are expressly prohibited on the Property. Construction of any new structures, including but not limited to both residential and agricultural structures, is expressly prohibited, . . .

> Mining.  No topsoil, sand, gravel, loam, rock, or other minerals shall be deposited on, excavated, dredged, or removed from the Property.

> Roads.  No new roads may be constructed or other portions of the Property covered with concrete, asphalt, or any other paving material. Existing roads and paved surfaces may be maintained in their current condition.

---

eighty ($9,933,880) dollars; the Deed of Conservation Easement dated May 8, 2004, reflects consideration paid to Newark of seven million six hundred twenty-seven thousand seven hundred eighty-two ($7,627,782) dollars; and the Deed of Conservation Easement dated May 31, 2006, reflects consideration paid to Newark of ten million ($10,000,000) dollars.

[15]  Under the Stipulations for Trial, Newark and West Milford agreed that the "conservation deeds impose the same restrictions on all the properties."  However, during trial Newark attempted to offer two additional conservation easements affecting Newark's watershed into evidence, dated May 28, 1998 (reflecting additional consideration paid to Newark of $4,000,000) and June 28, 2000 (reflecting additional consideration paid to Newark of $1,432,000), which Newark's counsel subsequently asserted contained slightly different restrictions.  Admittedly however, Newark failed to furnish the two additional conservation easements to West Milford during discovery. Moreover, Newark's counsel represented to the court that "there is no doubt that [Newark's valuation expert] did not use these [two additional conservation] easements in any way in forming his opinion."  Further, Newark's valuation expert did not identify the two additional conservation easements in his appraisal report or during his direct or cross examination.  Accordingly, the court declined to admit the two additional conservation easements into evidence due to the potential prejudice that would be imparted on West Milford and because neither Newark's valuation expert, nor West Milford's valuation expert, relied on same in formulating their opinions and conclusions of value in these matters.






Trash. No dumping or placing of trash or waste material shall be permitted on the Property.

Natural resource protection. No activity shall be permitted on the Property that would be detrimental to drainage, flood control, water conservation, erosion control, or soil conservation.

Timber harvesting. Clear cutting of timber stands is expressly prohibited. However, select trees may be cut to: control insects and disease; to prevent personal injury and property damage; for firewood to be used for on-site domestic purposes; and for the preservation of plant and animal species and natural communities described in this Easement. Such selective cutting shall be done under the supervision of a New Jersey State Forester, and with prior approval by the Grantee. Any commercial timber harvesting on the Property shall be conducted on a sustainable yield basis and in accordance with an approved Forest Stewardship Plan.

Importantly, under the Conservation Easements, Newark further covenanted and agreed to "allow[] pedestrian access along existing and currently utilized interior trails operated by [Newark]." Newark assumed the affirmative obligation to "allow public access . . . for public hunting and fishing [however, it] . . . may charge reasonable fees and impose reasonable rules for access, by means of a public permit system."[16]

Newark remained solely responsible for all real estate taxes, maintenance, and upkeep of the subject property, including the hiking, and walking trails. However, the Conservation Easements afford the NJDEP the right to establish a "trail system" designed "to reasonably, safely,

---

[16] The Conservation Easements further recite that: "[t]he City of Newark's Pequannock Watershed is a critical water supply and aquifer recharge area and comprises the largest mass of contiguous New Jersey Highlands. This . . . includes past easement acquisitions, totaling over 23,600 acres of the City of Newark owned lands . . . Extensive critical habitat for Federal and State threatened and endangered species is present. These species include bobcat, bald eagle, barred owl, Cooper's hawk, red-shouldered hawk, and wood turtles. The acquisition of easements will ensure protection from development and allow for recreational public uses. Land is primarily wilderness with significant forest, species diversity, streams, ponds and reservoirs. Public access including hunting and fishing will be permitted. . . ."






and efficiently establish . . . [trail] connections." The Conservation Easements further grant the NJDEP the right to "enforce and assure compliance" by Newark with its obligations under the Conservation Easements.

In sum, the Conservation Easements impose strict constraints on the subject property's permitted uses, beyond the development and sale restrictions traditionally associated with watershed property under the Watershed Protection Act,[17] the Highlands Preservation Act,[18] and local zoning laws.

### B. Arguments presented

During trial, Newark's valuation expert posited that of the legally permissible uses he identified for the subject property, none pass the financially feasible test under the highest and best use analysis. Accordingly, he maintained that the subject property does not have a highest and best use, and consequently, has no demand and no value in the marketplace. Newark further

---

[17] The Watershed Protection Act does not prohibit the use or sale of watershed land, but rather, "places limitations on the conveyance of watershed property." City of Newark v. Twp. of Hardyston, 285 N.J. Super. 385, 389 (App. Div. 1995)." Applications for exemptions under the Watershed Protection Act are "made subject to consideration by the Review Board, which was created by the Act, consisting of the Commissioner of DEP, the Commissioner of the Department of Community Affairs and the President of the [Board of Public Utilities]." In re Hackensack Water Co., 249 N.J. Super. 164, 169 (App. Div. 1991).

[18] The Highlands Preservation Act "creates two areas within the [Morris, Sussex, Passaic, Bergen, Warren, Hunterdon, and Somerset Counties] Region: a preservation area, in which further development is strictly regulated, and a planning area, in which development consistent with the Act's goals is encouraged." OFP, L.L.C. v. State, 395 N.J. Super. 571, 576 (App. Div. 2007). Thus, although the Highlands Preservation Act imposes strict regulations on development, it also creates an administrative process affording property owners the ability to seek a hardship waiver from the NJDEP under the act. N.J.S.A. 13:20-33(b), provides that the NJDEP review program "may allow for a waiver of any provision of a Highlands permitting review on a case-by-case basis if determined to be necessary by the department in order to protect public health and safety; [or] . . . for redevelopment in certain previously developed areas [or] . . . to avoid the taking of property without just compensation." N.J.S.A. 13:20-33(b).

   

maintains that because the subject property has no value, it was relieved of the obligation to present evidence of the subject property's true or market value, as of each valuation date involved herein.

In response, West Milford acknowledges that the Conservation Easements prohibit development and require Newark to maintain the subject property in its natural forested condition. Moreover, West Milford concedes that the Conservation Easements mandate Newark afford public access for passive recreational uses. Thus, West Milford agrees that the subject property's potential developability for any commercial, agricultural, or residential purposes is severely compromised. However, West Milford emphasizes that, as of each valuation date, the subject property was maintained as open space, in its natural undeveloped state, and operated by Newark for passive recreational activities, which was a legally permissible use.

During trial, West Milford elicited opinion testimony from a New Jersey land conservation and land preservation expert concluding that a demand and market exists for land to be maintained as open space and devoted to passive recreational uses. Moreover, after conferring with market participants, examining land sales, and conducting a highest and best use analysis, West Milford's valuation expert concluded that that the subject property's highest and best use is for it to be maintained as open space, in its natural undeveloped state, for passive recreational activities.

Therefore, the central issues in dispute between Newark and West Milford are: (i) due to the Conservation Easements, zoning, and other legal restrictions, does the subject property have a highest and best use; (ii) what use, if any, is the subject property's highest and best use; and (iii) what is the most appropriate method for deriving the subject property's true or market value for tax assessment purposes.






## II.    Conclusions of Law

### A.    Assessment and valuation of watershed property; N.J.S.A. 54:4-3.3

In general, property owned by the State, a county, a municipality, or their agencies or authorities, and used for a public purpose, is exempt from local property taxation. See N.J.S.A. 54:4-3.3; N.J.S.A. 54:4-3.6; N.J.S.A. 40:14B-63. However, our Legislature crafted an exception to that general rule, under L. 1910, c. 118 (supplementing the General Tax Act of L. 1903, c. 208), imposing taxes on property held by county, municipal, and public agencies for the protection of a public water supply. The exception is set forth under N.J.S.A. 54:4-3.3 and states, in part:

> The lands of counties, municipalities, and other municipal and public agencies of this State used for the purpose and for the protection of a public water supply shall be subject to taxation . . . at the taxable value thereof, . . . in the same manner and to the same extent as the lands of private persons, but all other property so used shall be exempt from taxation.
>
> [N.J.S.A. 54:4-3.3. (emphasis added).]

Accordingly, any real property owned and used by a county, municipality, or public agency for the protection of a public water supply must be valued and assessed "at such price as, . . . it would sell for at a fair and bona fide sale by private contract on October 1 next preceding the date on which the assessor shall complete [the] assessments." N.J.S.A. 54:4-23. Notably however, any improvements erected on the property are exempt from local property taxation. N.J.S.A. 54:4-3.3.

### B.    Newark's watershed

The assessment and valuation of Newark's watershed and its associated water supply has an extensive legal history. See City of Newark v. Jefferson Twp., 25 N.J. Misc. 363 (N.J. Div. Tax Appeals 1947); Newark City v. West Milford Twp., 9 N.J. 295 (1952); City of Newark v. Vernon Twp., 1 N.J. Tax 90 (Tax 1980), aff'd, 179 N.J. Super. 332 (App. Div. 1981); Newark v.






West Milford Twp., 7 N.J. Tax 35 (Tax 1984); Newark City v. Cedar Grove Twp., 7 N.J. Tax 66

(Tax 1984); Newark City v. Jefferson Twp., 13 N.J. Tax 217 (App. Div. 1992); City of Newark v.

Twp. of Hardyston, 285 N.J. Super. 395 (App. Div. 1995); City of Newark v. Twp. of Jefferson,

31 N.J. Tax 303 (Tax 2019), rev'd, 466 N.J. Super. 173 (App. Div. 2021).

However, the seminal case involving the assessment and valuation of Newark's watershed

is Newark City v. West Milford Twp., 9 N.J. 295 (1952). Faced with the valuation of substantially

the same properties involved in the instant matters, our Supreme Court addressed the statutory

considerations inherent with the valuation of large tracts of municipally owned watershed under

N.J.S.A. 54:4-3.3. The Court highlighted that N.J.S.A. 54:4-3.3, "applies only to the lands of the

municipality [used for the protection of a public water supply] and exempts its other property in

the watershed." Id. at 300. Importantly, the Court observed that:

> the purpose and intent of the statute [N.J.S.A. 54:4-3.3] . . . , is to
> distribute the tax burden . . . equally between the municipality
> owning watershed lands and the lands of the other taxpayers of the
> district. It subjects such lands to taxation at their true value on the
> same terms and conditions as the lands of the other taxpayers in the
> district are subjected to.
>
> [Id. at 301-02. (emphasis added).]

The Court expressed that the maintenance and ownership of watershed property represents

"the exercise of a proprietary function by the municipality owning it. . . ." Ibid.[19] Thus, a

---

[19] A municipality engages in a proprietary function when it "performs a service which might well
be provided by a private corporation. . . ." Weeks v. Newark, 62 N.J. Super. 166, 178 (App. Div.
1960) (quoting Prosser, Law of Torts, 109 (2d. ed. 1955)). The safeguarding and "distribution of
water by a municipality to its inhabitants for domestic and commercial uses is a private
or proprietary function which in its exercise is subject to the rules applicable to private
corporations." Reid Dev. Corp. v. Parsippany-Troy Hills Twp., 10 N.J. 229, 233 (1952) (citing
Lehigh Valley R.R. Co. v. Jersey City, 103 N.J.L. 574, aff'd, 104 N.J.L. 437 (E. & A. 1928); Fay
v. Trenton, 126 N.J.L. 52 (E. & A. 1941)).






municipality's ownership of watershed property is akin to that of a private landowner, and N.J.S.A. 54:4-3.3 requires the property to "be assessed in the same manner and to the same extent as lands of private persons." Id. at 303. Consequently, the Court found that the tax assessments imposed on Newark's watershed must comport with N.J.S.A. 54:4-23 (requiring the tax assessor to determine the "full and fair value of each parcel of real property . . . at such price as, . . . it would sell for at a fair and bona fide sale by private contract on October 1 next preceding the date on which the assessor shall complete his assessments. . . .")

The Court emphasized that N.J.S.A. 54:4-3.3 expressly prohibits the "assessment of [watershed] lands as part of an integrated [water] utility. . . ." Id. at 302. It observed that valuing watershed property as part of an integrated water utility would "result in a higher valuation and would burden the municipality owning the watershed property with a disproportionate share of the tax burden." Id. at 302. Because the "sale of such a vast tract is ordinarily a practical impossibility, any valuation placed upon such lands on a theoretical sale basis would result in a valuation much lower than the value of the aggregate of comparable lands of private persons." Resulting in a "disproportionate share of the tax burden . . . [being] visited upon the other taxpayers in the district." Ibid.

The Court recognized the inherent difficulty encountered in attempting to arrive at a value for such vast property, expressing that "[i]t is not possible to measure with mathematical precision the value of the lands here assessed because comparable property . . . are rarely the subject of sale." Ibid. However, the Court articulated that the tax assessment of Newark's watershed "must be fixed by a reasonable and equable comparison with the true value of smaller comparable holdings of private persons" in the taxing district or nearby. Ibid. The court reasoned that a "reasonably






approximate and comparable true value based upon the same principles of taxation applicable to

[smaller comparable land] holdings of private persons will" comply with the statutory mandate.

Ibid.

Ultimately, the Court concluded that, the value of watershed lands,

> will have to be determined by comparison of the representative
> component parts of the various classification of the lands, . . . with
> the true value of comparable parcels of land owned by private
> persons adjacent to the watershed or reasonably nearby in the
> township, measured by the standard of value established by a fair
> and bona fide sale at private contract.

> [Id. at 308.]

In the seventy years that have followed the ruling in Newark City v. West Milford Twp.,

our Legislature has enacted a series of laws further impacting the development of certain watershed

property including the Watershed Protection Act, the Highlands Preservation Act, and the

Freshwater Wetlands Act. Consequently, in attempting to determine the highest and best use and

true or market value of watershed property, our courts have navigated the corridor between valuing

watershed and water producing property as private land, in a manner consistent with the private

lands of other property owners, and as land burdened by legal restrictions that severely constrain

any development potential. See Appeal of East Orange, 80 N.J. Super. 219 (App. Div. 1963); East

Orange v. Livingston, 102 N.J. Super. 512 (Law Div. 1968), aff'd, 54 N.J. 96 (1969); City of

Newark v. Vernon Twp., 1 N.J. Tax 90 (Tax 1980), aff'd, 179 N.J. Super. 332 (App. Div. 1981);

Newark v. West Milford Twp., 7 N.J. Tax 35 (Tax 1984); Newark City v. Jefferson Twp., 13 N.J.

Tax 217 (App. Div. 1992); City of Newark v. Twp. of Hardyston, 285 N.J. Super. 395 (App. Div.

1995); East Orange City v. Livingston Twp., 15 N.J. Tax 36 (Tax 1995); Jersey City, Div. of Water

v. Parsippany-Troy Hills Twp., 16 N.J. Tax 504 (Tax 1997); City of Newark v. Twp. of Jefferson,






31 N.J. Tax 303 (Tax 2019), rev'd, 466 N.J. Super. 173 (App. Div. 2021).

Importantly, directly probative, and relevant to the instant matters, several other reported decisions have offered meaningful insight into how private land, bound by conservation easements for public use and/or under the New Jersey Conservation and Historic Preservation Restriction Act, should be valued for tax assessment purposes. See Ridgewood v. Bolger Foundation, 104 N.J. 337 (1986) (discussed infra); Englewood Cliffs v. Estate of Allison, 69 N.J. Super. 514, 529 (App. Div. 1961) (discussed infra).

Therefore, embarking on the journey to discern the subject property's true or market value, the court must not only focus on the subject property's status as watershed, but sensibly weigh the impact that the Conservation Easements have in arriving at its highest and best use, and ultimately, in discerning its true or market value.

C.    Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998). This presumption of validity denotes that the appealing taxpayer shoulders "the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of the proofs, the party challenging the local property






tax assessment must have presented the court with evidence raising a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

At the close of Newark's proofs, West Milford moved to dismiss these matters under R. 4:37-2(b), arguing that the presumption of validity that attaches to the subject property's tax assessments and the Passaic County Board of Taxation's judgments had not been overcome.[20] The court denied the motion and placed a statement of reasons on the record. Without recapitulating those findings and conclusions herein, the court found that affording Newark all reasonable and legitimate inferences that could be deduced from the evidence presented, Newark produced cogent evidence sufficient to overcome the presumption of validity. The opinions of Newark's valuation expert, if accepted by the court as true, raised debatable questions as to the validity of the subject property's tax assessments.[21]

---

[20] West Milford argued, in part, that Newark's valuation expert's analysis was flawed for several reasons, including that: (i) he did not stabilize the income from passive recreation uses; (ii) his appraisal report did not reflect any analysis of the passive recreation fees charged in the marketplace; (iii) the "hypothetical assumption" applied by Newark's valuation expert that, the cutting and sale of trees for off-premises use as firewood is not permitted under the Conservation Easements; (iv) the values attributable to non-appurtenant woodland under the Farmland Assessment Act are only recommended values; (v) Newark's valuation expert did not personally confer with market participants to ascertain if there was a market for land dedicated to open space or passive recreation; and (vi) Newark's valuation expert failed to consider the eco-tourism market in West Milford.

[21] The court emphasizes that although West Milford's tax assessor testified during trial, no evidence was elicited from him regarding how the subject property's tax assessments were determined. Rather, the scope of his testimony focused on the location and physical characteristics of several lots; his review of other taxpayers' woodland management plans for land stewardship or farmland assessment purposes; whether West Milford has appurtenant and non-appurtenant woodlands; and his familiarity with commercial timbering operations in West Milford. Additionally, West Milford's tax assessor expressed that he did not increase the subject property's tax assessments. Rather, he explained that West Milford instituted tax appeals before the Passaic County Board of Taxation seeking to increase the subject property's assessments and the increased assessments were the result of judgments entered by the Passaic County Board of Taxation.






However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer . . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15 (citing Pantasote Co., 100 N.J. at 413).

D.   Highest and Best Use

Before determining a property's true or market value one must analyze the marketplace to discern the property's highest and best use. Ford Motor Co., 10 N.J. Tax 153, 161 (Tax 1988), aff'd, 127 N.J. 290 (1992). "For local property tax assessment purposes property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). This principle has been a construct of New Jersey jurisprudence since 1890. See Currie v. Waverly & New York Bay Railroad Co., 52 N.J.L. 381, 391 (E. & A. 1890) (stating that "best and highest use in view of its adaptability for those purposes which give the land its highest market value").

Highest and best use is often defined as "[t]he reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value." Appraisal Institute, The Dictionary of Real Estate Appraisal 93 (5th ed. 2010). "The concept of highest and best use is not only fundamental to






valuation but is a crucial determination of market value. This is why it is the first and most important step in the valuation process." Ford Motor Co., 10 N.J. Tax at 161 (citing The Appraisal of Real Estate at 41-42, 68, 269-270, 292 (9th ed. 1987)).

To discern a property's highest and best use, an appraiser must sequentially consider "the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. Twp. of South Hackensack, 27 N.J. Tax 255, 268 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015). The appraiser must evaluate all reasonably possible legal and physical uses of the property, gauge the demand in the marketplace, identify the most probable users of the property, and discern the property's most probable market value based on the concluded highest and best use. When conducting a highest and best use analysis, the valuation expert must scrutinize the physical surroundings, zoning ordinances, and legal restrictions applicable to the parcel being appraised, and consider "all possible [permitted] uses and [select] that use which will yield the highest return. . . ." Inmar Associates, Inc. v. Edison Twp., 2 N.J. Tax 59, 64 (Tax 1980). In sum, the highest and best use analysis is an investigation, interpretation, and "economic study of [legal restrictions and] market forces focused on the subject property." Appraisal Institute, The Appraisal of Real Estate, 305 (11th ed. 1996).

1. Newark's valuation expert

Based on Newark's valuation's expert's review of the Conservation Easements and legal restrictions, he narrowed his consideration to the following five potential uses of the subject property: (a) integrated water utility; (b) development in accordance with West Milford's R-4 low density single family residential district zoning ordinance; (c) the growth and sale of firewood; (d)






commercial timber harvesting; and (e) passive recreation.

### a. Integrated water utility

On this issue, Newark's valuation expert succinctly testified that, "based on legal instructions, I didn't consider . . . integrated water utility, in determining the highest and best use since it is not a permitted highest and best use because you can't assess, or you can't value the property predicated on its integrated water utility use."[22]

### b. Development under zoning ordinance

Newark's valuation expert rejected consideration of any development of the subject property under West Milford's R-4 low density single family residential district zoning ordinance because "none of those permitted uses within the [R-4] zone are permitted as per the [Conservation] Easement[s]." In his opinion, because the subject property is "restricted in use and development by several factors including Conservation Easement[s], the Highlands Preservation Act, the Watershed Moratorium Act and other restrictions . . . none of the 'permitted uses' [under West Milford's the R-4 zoning district] are applicable."

### c. Growth and sale of firewood

Newark's valuation expert also rejected the growth and sale of firewood as a highest and best use because, the "Conservation Easements . . . says [] that you can use firewood however, it has to be used within the four corners of the Newark watershed property, you cannot take the

---

[22] The court interprets his reference to the holding in Newark v. West Milford Twp. that, N.J.S.A. 54:4-3.3 "impliedly prohibits an assessment of such lands as part of an integrated utility with the resultant increment to the value of such lands because of their integrated use." 9 N.J. at 302.


Interpreter


ADA
Americans with
Disabilities Act

ENSURING
AN OPEN DOOR TO
JUSTICE



firewood off of the property and sell it on a commercial basis."[23]

### d. Commercial timber harvesting

Based on his interpretation of the Conservation Easements, Newark's valuation expert opined that cutting trees on the subject property is prohibited "unless it is necessary to maintain the existing road and trails . . . the easement provides for maintaining the overall property . . . maintaining the trees within the 16,500 acres, for maintaining the trails or the roads for the water supply for conservation purposes, including . . . wildlife management and fire prevention, clear cutting, as per the easement is strictly prohibited."

He further opined that, commercial timber harvesting should be rejected as a potential highest and best use for the subject property because,

> [he] read the sworn testimony in the recent Jefferson [Twp.] v. Newark trial,[24] and Judge Bianco's opinion in that matter concluded that there was no market for commercial timber operations in New Jersey, the appraiser in that case . . . testified . . . that he found no sales of timber land in the State of New Jersey, . . . I undertook the same survey and I found no sales of timber land in the State of New Jersey, so knowing that we'd have to generate in excess of $1,600,000 in revenue from [the sale of] timber in order just to pay the taxes, I found that the feasibility of arriving at a highest and best use based on the sale of timber was not feasible, predicated again on Judge Bianco's decision, on [the appraiser in that case] conceding that there were no sales of timber land . . . along with my own research corroborating that there was no [sales of] timber land in this State, I concluded that this was not an avenue that I was going to go down in order to figure if this was a highest and best use.

In sum, in Newark's valuation expert's opinion, if "there was no market for timber, . . . [in

---

[23] However, after concluding the subject property had no highest and best use, Newark's valuation expert valued the subject property "using the hypothetical assumption that the sale of firewood is permitted and that it is financially feasible to do so."

[24] City of Newark v. Jefferson Twp., 31 N.J. Tax 303 (Tax 2019), rev'd, 466 N.J. Super. 173 (App. Div. 2021).


Interpreter


ADA
Americans with Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



the Newark City v. Jefferson Twp. trial] there was no reason why . . . [he should conclude] a

highest and best use of [commercial] timber [harvesting]."

     e.     Passive recreation and open space preservation

Newark's valuation expert observed that the subject property is presently "primarily [being

used] for passive recreational purposes," including "hunting, fishing, horseback riding, those types

of . . . activities."[25]  Based on his review of data from 2014 to 2021, he determined that Newark

generated average annual revenue of approximately $93,052 from the sale of passive recreation

permits on the watershed.  However, despite Newark's actual use of the subject property for

passive recreation activities, as of each valuation date at issue, he rejected passive recreation as a

highest and best use because, in his opinion,

> it would not be financially feasible . . . based on the total income
> from the 35,000 acres, of approximately . . . $95,000, and based
> upon the operating expenses that it takes to run this property, which
> includes guards, . . . , a forester, . . . , there's a staff of individuals
> that are needed to run the facility, there's insurance that is needed
> to be covered for . . . the 35,000 acres . . . , so in essence the West
> Milford portion of the property derives . . . somewhere in the mid-
> $40,000 of income [annually], and the West Milford's section
> needs to supply the insurance, the personnel, the forester . . . and
> that's without even talking about the real estate taxes that would
> need to be paid as per the current assessment on the property . . . so
> when you talk about those income and expenses there's no net
> income . . . and we . . . need to start somewhere with a net income
> in order to capitalize that net income to arrive at a . . . market value.

Thus, because he found that Newark's use of the subject property for passive recreation

did not generate a positive net income, he concluded that, it was not a financially feasible highest

and best use.  In his opinion, for passive recreation to be financially feasible, the revenue derived

---

[25]  Newark's expert characterized passive recreational activities as those "that do not require
prepared facilities like sports fields or pavilions."






from the sale of recreation permits would have to be sufficient to pay the costs associated with,

> the selling of permits, the costs of personnel, the equipment, . . . the website, you'd have to have enough to pay for insurance on the entity, you'd have to pay just the personnel and management of the facility, and you would have to include in that the expenses associated with the real estate taxes or property taxes.

Moreover, in his opinion, "there was no market for a buyer of the property for passive recreational purposes." According to Newark's valuation expert, there were only three "conceivable buyers" for the subject property, the Passaic County Park Commission, the New Jersey Department of Environmental Protection, or West Milford. Based on his review of the Passaic County Parks, Recreation and Open Space Master Plan and other considerations, he concluded that neither the Passaic County Park Commission, the New Jersey Department of Environmental Protection, or West Milford would be interested in acquiring the subject property.[26]

Additionally, in his estimation, "no private enterprise would purchase the subject [for

---

[26] In Newark's valuation expert's opinion, West Milford would not be interested in acquiring the subject property because it would "lose a ratable" and there is "already a significant amount of passive recreation within the West Milford state park system." Moreover, based on his review of the Passaic County Parks, Recreation and Open Space Master Plan ("Master Plan"), Newark's expert concluded that expansion of the Passaic County parks and open space areas would focus on the southern portions the county, not the West Milford area. Newark's expert further opined that the New Jersey Department of Environmental Protection would not be interested in acquiring the subject property "because it wouldn't add to the amount of land available to the people in the State of New Jersey for passive recreation purposes, because they already own it, [and] because the New Jersey public conservation and recreational demand . . . exceed[s] available funding." Finally, in Newark's expert's opinion, a "conservation agency would [not] be interested in purchasing the subject property for passive recreation [uses] . . . because it's not the purpose for which conservation organizations have been established, conservation organizations historically purchase land to conserve and preserve . . . it in its natural state, the subject . . . is already being preserved in its natural state in perpetuity. . . ." Newark's expert expressed that, "I don't believe that anyone would purchase the property for conservation purposes . . . primarily because neither the State of New Jersey or a conservation organization would have any incentive to purchase the property to conserve it in its natural state, because the subject property is already been conserved in its natural state, in perpetuity, by the conservation easements."






passive recreation] because it is not financially feasible to do so . . . there was no way to generate an income that would be financially feasible. . . ."

In Newark's valuation expert's opinion, the conservation or preservation of land for open space is a motivation for acquiring real property, not a highest and best use. Quoting directly from the text of The Appraisal of Real Estate, Newark's valuation expert testified that,

> conservation and preservation are not uses of land. Rather, they are the motivations of individuals or groups for acquiring certain properties. The physical uses in these cases could generally be characterized as 'leave the land vacant' or 'do not change the historic improvements.' A parcel of land encumbered by a conservation easement would have legal limits on use, leaving 'continue the existing use unchanged' or 'development to some limited degree as agreed upon by contract' as the only legally permissible use of the land.

[ Id. at 311 (15th ed. 2020).]

In sum, Newark's valuation expert stated that, "I did not find a highest and best use that was legally permissible and financially feasible." As such, in his opinion, "there was no market value for the subject property . . . [within] the framework of highest and best use." (emphasis added). According to Newark's valuation expert, not every parcel of land or real property must have a value ascribed to it.

Therefore, to arrive at his opinion of value for the subject property, he applied the "extraordinary assumption" that "cutting [fire]wood for sale is financially feasible." Deriving a value for the subject property ranging between $150 to $158, per acre, as "Group B" non-appurtenant woodland, or "land that qualifies for farmland assessment but is not part of an otherwise qualified farm," under values established by New Jersey's Farmland Evaluation Committee.






2.  West Milford's land conservation and land preservation expert

According to West Milford's land conservation and land preservation expert ("Mr. Pinto"), the term 'open space' refers to land that is preserved and undeveloped, and that is accessible to the public.[27] Mr. Pinto explained that, in New Jersey, land can be either conserved or preserved to achieve a variety of purposes, uses, and goals, including public enjoyment, preservation of wildlife habitat, passive and active recreational uses, protection of groundwater and water supply, protection of agriculture, and preservation of historic sites. In his view, "there is a value to open space for society, for the general public, there's a need for recreation lands and for citizens of a State . . . , to be able to get outside and enjoy open lands, it adds value to one's life . . . there's a human need for people to get outside and enjoy the natural environment."

According to Mr. Pinto, in New Jersey, the acquisition of most land for open space purposes is funded under the Green Acres program.[28] However, he explained that, once land is

---

[27] N.J.S.A. 40:55D-5 defines "open space" as "any parcel or area of land or water essentially unimproved and set aside, dedicated, designated or reserved for public or private use or enjoyment or for the use and enjoyment of owners and occupants of land adjoining or neighboring such open space; provided that such areas may be improved with only those buildings, structures, streets and offstreet parking and other improvements that are designed to be incidental to the natural openness of the land or support its use for recreation and conservation purposes." Moreover, N.J.S.A. 13:8C-3 defines "recreation and conservation purposes" as "the use of lands for beaches, biological or ecological study, boating, camping, fishing, forests, greenways, hunting, natural areas, parks, playgrounds, protecting historic properties, water reserves, watershed protection, wildlife preserves, active sports, or a similar use for either public outdoor recreation or conservation of natural resources, or both."

[28] The Green Acres Land Acquisition Act of 1961, N.J.S.A. 13:8A-1 to -18, the Green Acres Land Acquisition Act of 1971, N.J.S.A. 13:8A-19 to -34, and the New Jersey Green Acres Land Acquisition and Recreation Opportunities Act, N.J.S.A. 13:8A-35 to -55 (collectively "Green Acres"). Green Acres declares, in part, that: (a) The provision of lands for public recreation and the conservation of natural resources promotes the public health, prosperity and general welfare and is a proper responsibility of government; (b) Lands now provided for such purposes will not be adequate to meet the needs of an expanding population in years to come; (c) The expansion of population, while increasing the need for such lands, will continually diminish the supply and tend






acquired under the Green Acres program it cannot easily be disposed of or resold and is subject to challenging resale and disposition restrictions, commonly known as a diversion process. See N.J.S.A. 13:8A-13; N.J.S.A. 13:8A-31. The Green Acres diversion process requires State approval, the payment of significant compensation by the local unit seeking to divert the property, and the identification and acquisition of a substitute property.

Based on his review and reading of the Conservation Easements, Mr. Pinto concluded that they were not funded under the Green Acres program, and therefore, the subject property is not subject to the burdensome Green Acres disposition restrictions. This factor was central to Mr. Pinto's analysis, because in his opinion, "there is no restriction on Newark selling the [subject] property, they could sell the entire landholdings out."

Mr. Pinto further explained that the subject property is "a little more open and more easily transferred than a Green Acres restricted property, so that's the big difference here, it's that there are opportunities . . . there's an extreme value to this property, even [with the] deed restrict[ions]." Although, Mr. Pinto acknowledged that the Conservation Easements afford the NJDEP a "right of first refusal" to acquire the subject property, and the Watershed Protection Act would require Newark to obtain other governmental approvals to sell it, in his experience, it would be possible to obtain those necessary governmental approvals.[29]

_____

to increase the cost of public acquisition of lands available and appropriate for such purposes; (d) The State of New Jersey must act now to acquire and to assist local governments to acquire substantial quantities of such lands as are now available and appropriate for such purposes so that they may be used and preserved for use for such purposes. . . ." N.J.S.A. 13:8A-2. See also N.J.S.A. 13:8A-20 (stating that "[t]he provision of lands for public recreation and conservation of natural resources promotes the public health, prosperity and general welfare and is a proper responsibility of government. . . .").

[29] The court's review of the Conservation Easement dated May 31, 2006, discloses that Article XIII provides that the "Grantee [NJDEP] acknowledges that the Conservation Easement . . . was






However, Mr. Pinto conceded that "in New Jersey, land such as Newark's [watershed] that are deed restricted [and] that are available for sale, that's not a common thing." Yet, in his opinion, based on his review of other open space land sale transactions, there is a continued utility and market for land that is restricted, either by deed or that is "someway impaired from development." In his own words, "I feel that there is a market for the property [as open space] if Newark would try and sell the property." That market would include uses for passive recreation, eco-tourism, timber harvesting (under a woodlands management plan), and potentially as carbon sequestering lands.[30]

Notably, Mr. Pinto opined that passive recreation and timber harvesting uses can "co-exist" on the subject property, "you can do both, and if they [Newark] steward their property appropriately, you carry it out without the public really having any loss of value to the property from a recreational perspective."[31]

Moreover, because the Conservation Easements do not prohibit the subject property from being owned by a private individual, private foundation, or a public corporation, in Mr. Pinto's

---

acquired with Federal Funds under the Forest Legacy Program (P.L. 101-624; 104 Stat. 3359) and the interests acquired cannot be sold or exchanged, or otherwise disposed, unless the United States is reimbursed the market value of the interest in land at the time of disposal."

[30] Mr. Pinto explained that there is a "growing market for carbon credits and the purchase of large properties for that purpose, very often those are being done by financial institutions and public corporations." According to Mr. Pinto, "the highest carbon sequestering lands are forested lands. So, the property can qualify, it doesn't even need to be by a lease or an easement, it can be done by contract, the lands can then be qualified for carbon credits. And now the trend in that market is for financial institutions . . . [to acquire land] for that purpose. . . . " However, admittedly, Mr. Pinto was unfamiliar with the carbon credit process and was not able to adequately explain its market.

[31] The court's review discloses that one of the Conservation Easements expressly states that "[s]ome harvesting may occur as permitted under an approved Forest Stewardship plan. Partial funding may come from the Federal Forest Legacy Program."



estimation, the market of potential purchasers for the subject property would include private individuals, land conservation groups, higher education institutions for forestry studies and/or research, public corporations (to demonstrate that they are environmentally conscious, responsible, and carbon neutral), and private water companies. According to Mr. Pinto, there are "a multitude of foundations and conservation groups that focus on acquiring properties . . . for public open space purposes, it's an entirely different funding source from the government and it's usually private monies that are dedicated for that purpose."

Mr. Pinto further offered that, for many of these organizations, their goal is to obtain control over a property, to "develop a contiguous land base, and when you do that, you develop a more natural habitat, you can increase threatened and endangered species habitat, and generally, allow the public a larger land base in which to [engage in] recreat[ion] . . . ." In his opinion, "[t]here is utility and value to open space lands even lands that are restricted from development, the reason for that is it gives control to the purchaser." Control affords an entity the right to "steward the property the way it sees most appropriate." Thus, despite the Conservation Easements constraints, according to Mr. Pinto, organizations would be interested in acquiring the subject property enabling them to control its stewardship and carry out their respective organizational missions and goals. In sum, Mr. Pinto concluded that there is a continued utility and market for the subject property as open space, for passive recreational uses.

### 3. West Milford's valuation expert

West Milford's valuation expert began his highest and best use analysis by examining the New Jersey Highlands Preservation Act interactive mapping. In his opinion, to examine all the physically possible uses of a property, an "appraiser needs to hone-in on the mapping to fully






understand the percentage of wetlands, the percentage of steep slopes, the percentage of woodlands."

He characterized Newark's watershed in West Milford as

> interact[ing] with the community it . . . is in the backyard of a variety of single-family homes as you are driving along . . . you can actually see the homes and can surmise . . . what is watershed land and a lot of these single-family homes, it just look likes woods in their backyard, [but it] is the watershed, so it's not just hundreds of thousands of miles of interior land, it's also land along the roadways.

After examining the mapping and having conducted both aerial and drive-by examinations of the subject property, West Milford's valuation expert expressed that "the majority of the land is interior land without an interior road network, steep slopes, wetlands, [and] rock outcroppings." Importantly, according to West Milford's valuation expert, although development of the land was physically possible, it would be limited to certain areas.

In addressing the legally permissible uses of the subject property, West Milford's valuation expert highlighted that there are "three . . . factors that dominate this land," the Highlands Preservation Act, the Watershed Protection Act, and the Conservation Easements. In his opinion, "these three encumbrances . . . make[] the property undevelopable." West Milford's valuation expert further opined that, because of these restrictions there are only "a couple of potential uses" like timbering, an outdoor shooting range, passive recreation, and open space,[32] that are permitted under West Milford's R-4 zoning ordinance and that would also be permitted under the Highlands Preservation Act, the Watershed Protection Act, and the Conservation Easements.

Significantly, he observed that the Conservation Easements not only detail the prohibited

---

[32] West Milford's valuation expert characterized the term open space, as preserving land and its natural resources in an unimproved condition with public access to the property.






uses of the subject property but require Newark to "assur[e that] the open-space character, wildlife habitat, scenic qualities and conservation values of the property . . . will be conserved and maintained forever. . . ." He emphasized that under the Conservation Easements, Newark assumed the obligation to afford "public access and to use the land for passive recreation purposes."

Turning to his financial feasibility and maximally productive analyses, West Milford's valuation expert testified that Newark is "currently . . . selling passes for a variety of passive recreational uses . . . they sell passes for hunting and fishing and boating and hiking and horseback riding. There are a variety of passive recreational uses which they sold passes."[33] According to West Milford's valuation expert, he "looked at . . . the recreational passes that were sold. One thing that I noticed is it does not seem like they're selling a lot of passes and obtaining a lot of income compared to what you might be able to do." Because Newark's watershed recreation manager testified that Newark had increased the permit fees only once during the last twenty years, in West Milford's valuation expert's opinion, "that leads me to believe that it's really not their focus and if they really wanted to run it as a business, they could do a variety of things to obtain greater income." Therefore, West Milford's valuation expert expressed that, "[s]o while I think from a financial feasibility standpoint maybe selling passes, it could be financially feasible or marginally financially feasible, I didn't pursue that any further."[34]

Moreover, in his opinion, using the subject property for commercial timbering was not a

---

[33] West Milford's valuation expert defined passive recreation as "recreational activities that don't require prepared facilities and place minimal stress on the site's resources. That could be hunting, camping, fishing, walking, bird watching, swimming, horseback riding, running and jogging, bicycle riding on . . . trails . . . , just to preserve the natural resources."

[34] In West Milford's valuation expert's opinion, the maintenance of land as open space and for public passive recreation does not need to be financially feasible because it satisfies human wants, needs, and desires.






financially feasible highest and best use. His conclusion was shaped by two principle factors: (i) testimony elicited during the City of Newark v. Jefferson Township watershed local property tax appeal matters from Robert Williams, a NJDEP approved forester;[35] and (ii) West Milford's valuation's expert's examination and research of the marketplace.[36] In his opinion, the subject property's estimated value for commercial timbering purposes, was approximately "a third of where . . . the value would be [in the market] for buying the property for open space or passive recreation" uses. According to West Milford's valuation expert, "because my research of sales showed a higher value, a greater value [for use as open space or passive recreation], which is essentially the definition of highest and best use," he did not find commercial timbering was the subject property's highest and best use.

However, based on his exchanges with Mr. Pinto, discussions with market participants, and his research of sales in the market, West Milford's valuation expert opined that there is a demand for land that is to be dedicated as open space with passive recreation.[37] He further testified that, he

> talk[s] to the market participants . . . I get calls every day from both
> the conservation groups and the governmental agencies and property

---

[35] According to West Milford's valuation expert, "timbering isn't a highest and best use . . . that I considered, because my research of sales showed a higher value, a greater value, . . . it's my recollection that Mr. Williams who was familiar with the types of trees that could be harvested on the West Milford side . . . he thought that there was value to timbering the property, he thought it could be profitable."

[36] West Milford's valuation expert was the appraisal expert for Jefferson Township in the matter reported at City of Newark v. Jefferson Twp., 31 N.J. Tax 303 (Tax 2019), rev'd, 466 N.J. Super. 173 (App. Div. 2021).

[37] West Milford's valuation expert testified that he is an appraiser approved by the New Jersey State Agriculture Development Committee ("SADC") for farmland preservation projects (under N.J.A.C. 2:76-6.21), and the New Jersey State Green Acres Program. In addition, he is "yellow book certified" under the United States Department of Agriculture's Forest Legacy Program, permitting him to appraise properties where federal funding is involved.

   

> owners to assist them with these open space acquisitions . . . Their
> focus, when they do open space acquisitions for passive recreation,
> is to preserve the natural resources, first and foremost. . . ."

Thus, in his opinion, there was a market for properties to be dedicated as open space and for "passive recreation in Northern New Jersey, especially in the areas where there's more environmentally sensitive land."

After evaluating the physically possible, legally permissible, financially feasible, and maximally productive uses, West Milford's valuation expert concluded that the highest and best use was continuing to maintain the subject property as "open space and passive recreation." In his opinion, characterizing the subject property as being used as open space or for passive recreation are "one and the same."[38]

According to West Milford's valuation expert, "passive recreation is a use that not only could be financially feasible, but it's an economic use that satisfies human wants, needs and desires." Based on his analysis, "there's a marketplace for properties and for acquisitions of properties that satisfy human wants, needs, and desires." The intent and purpose of conserving and preserving the subject property is "not only to preserve our natural resources . . . , but [to enable] use [of] it . . . , we can utilize [the property] to hike on and to fish in and . . . to utilize [it] on an everyday basis in our daily activities."

Acknowledging the contrary opinion expressed by the authors of The Appraisal of Real Estate, West Milford's valuation expert explained that his "charge," as a New Jersey real estate

---

[38] During cross-examination, West Milford's valuation expert attempted to distance himself from that statement, testifying instead that open space is land preserved in its natural state that does not need to be open to the public. Whereas passive recreation denotes "the public . . . utiliz[ing] this property for . . . hiking, for boating, for fishing, for hunting, for cross-country skiing, for horseback riding." (emphasis added).

   

appraiser is not only to arrive at a valuation based on "what I think, [and from] . . . discussions from the literature." Rather, the highest and best use analysis requires him to evaluate the marketplace, and "if there's demand in the marketplace and if there's . . . caselaw involved . . . in the State of New Jersey," he must give primary consideration to those factors. He further expressed that "there are two very important cases that I read and reviewed in conjunction with preparing my appraisal report," that played a pivotal role in forming his opinions of the subject property's highest and best use, East Orange City v. Livingston Twp., 15 N.J. Tax 36 (Tax 1995), and Jersey City, Div. of Water v. Parsippany-Troy Hills Twp., 16 N.J. Tax 504 (Tax 1997).[39] In his opinion, these cases are "spot-on to the same issues we're dealing with here because those two cases are dealing with buffer land which surrounds reservoirs."

4.    Court analysis

At the outset, the court emphasizes that its analysis of the subject property's highest and best use is guided not only by the testimony and evidence elicited during trial, but our state's statutes, and the jurisprudence that has evolved interpreting those laws. Thus, although The Appraisal of Real Estate is a respected and often quoted treatise providing useful guidance for jurists, property owners, and appraisers, the court cautions that the statements expressed therein represent the opinions and views its appraiser authors and organization. Accordingly, while valuable and instructive, its content bears no precedential weight and its opinions do not always align with our state's jurisprudence.[40]

---

[39] West Milford's valuation expert's testimony disclosed that he reviewed the court opinions, but also obtained and reviewed three of the valuation experts' appraisal reports in those matters.
[40] The text excerpt quoted by Newark's valuation expert is contained under the section heading, "distinguishing the physical use of real estate from the motivations of users." Importantly, the context of these statements are aimed at warning or cautioning appraisers in identifying, analyzing,






Rather, the court stresses that attempting to apply conventional valuation principles to land with ecological significance or natural resources that are environmentally critical to the continued survival of humanity is often fraught with hazards and pitfalls. In the opinion of one author, "traditional property appraisal methods are often unsuitable for determining the fair market value of property burdened with conservation easements." David C. Stockford, Property Tax Assessments of Conservation Easements, 17 B.C. Envtl. Aff. L. Rev. 823, 838 (1990). Similarly, another author has expressed the view that the "organizations that oversee and regulate appraisal standards are not 'up to date' with a new and important trend: a new set of buyers for properties with important ecological features has emerged." Adam I. Davis, The Nature of Value and the Value of Nature: A Review of Appraisal Methodology Concerning Natural Resource and Environmental Values, Lincoln Institute of Land Policy, 2 (2014).[41]

Importantly, the court underscores that one constant exists under our state's jurisprudence and the writings, when conducting a highest and best use analysis consideration must be given not only to zoning laws and market forces, but to the bundle of rights and encumbrances that

---

and selecting comparable land sales. For example, the motivation of a purchaser in acquiring an undeveloped parcel of land, that is free from encumbrances, may be to dedicate it for open space use. However, the purchaser's motivation to dedicate it for open space may not be the highest and best use of the land. In sharp contrast, the arms-length sale of land already burdened by legal encumbrances or conservation easements, limiting its potential uses, will generally reflect its highest and best use, and consequently, its true value. The reason for this is because the legal restrictions have dictated what its value is in the market. Here, the court's obligation, under N.J.S.A. 54:4-3.3, is to discern what the subject property would sell for on October 1st of the pretax year at a "fair and bona fide sale by private contract." N.J.S.A. 54:4-23.

[41] See also Jeff Pidot, Reinventing Conservation Easements, Lincoln Institute of Land Policy (2005); Jennifer Rigby, Property Tax Appraisal of Conservation Easements in Utah, 18 J. Land Resources & Envtl L. 369 (1998); Costanza, d"Arge, de Groot, Farber, Grasso, Hannon, Limburg, Naeem, O'Neill, Paruelo, Raskin, Sutton & van den Belt, The value of the world's ecosystem services and natural capital, Nature, vol. 387 (May 15, 1997).






accompany or burden the land.  See Ridgewood v. Bolger Foundation, 104 N.J. 337 (1986);

Prowitz v. Ridgefield Park Village, 237 N.J. Super. 435, 439 (App. Div. 1989); In re Appeal of

East Orange, 80 N.J. Super. 219, 230-31 (App. Div. 1963); Estate of Allison, 69 N.J. Super. at

530; Bergen Cty. v. East Rutherford Bor., 12 N.J. Tax 399, 413 (Tax 1992), aff'd, 265 N.J. Super.

1 (1993); Newark City v. Jefferson Twp., 13 N.J. Tax 217, 221 (App. Div. 1992).

Thus, when gauging the highest and best use of a property, the appraiser must "focus on

the physical parcel and the accompanying property rights.  These rights include the right to . . .

[p]reserve the land in perpetuity via an easement, donation, or sale to a nonprofit or government

entity."  The Appraisal of Real Estate at 336 (15th ed.) (emphasis added).  That text further

emphasizes that:

> development rights can greatly affect the value of land . . . A trend
> in the United States has been the acquisition of land through open
> space or conservation easements that are held in perpetuity by
> qualified agencies.  These permanent encumbrances limit or prohibit
> the development potential of land.  The potential uses of land subject
> to perpetual open space or conservation easements are usually
> restricted, as specified in the deed of easement, and thus the value
> of the land is affected.
>
> [Id. at 337 (emphasis added).]

Accordingly, although the opinions expressed by appraisers and property valuation

professionals do not always align with our state's jurisprudence, they generally all concur that in

valuing land encumbered by restrictions dedicating it as open space for use by the public,

consideration must be given to how those restrictions impact true or market value.

Correspondingly, the analysis of the land's highest and best use must appropriately account for

those limitations.  Therefore, central to the court's evaluation of highest and best use is not only

the traditional reasonably probable legal use of land that is physically possible, financially feasible,






and maximally productive, but the more specific role or impact that the constrained property rights have on defining the legal uses of the land.

Contrary to the opinion expressed by Newark's valuation expert (as recited from the text of The Appraisal of Real Estate), the court's examination and analysis of our state's jurisprudence has disclosed two published decisions concluding that undevelopable land can have a highest and best use for conservation as open space.[42]

In East Orange City v. Livingston Twp., 15 N.J. Tax 36 (Tax 1995), the court was faced with attempting to discern the true value of thirty-six separately assessed contiguous lots, comprising approximately 1,422 acres of land owned by East Orange, and used as a below-surface aquifer for the supply of water to its residents. In that case, the valuation experts determined that portions of the property (between 635 to 1,336 acres) were impacted by the Freshwater Wetlands Act and were constrained or wholly undevelopable. However, other portions of the property (between 86 to 806 aces) were developable. In addition, a sewer moratorium having an "indefinite duration," prohibiting sewer connections for new residential property was in place in the taxing district. Id. at 39.

The court found that Livingston Township did not present "one scintilla of evidence to support the . . . conclusion that sewer connections for new residential development were available

---

[42] In Hackensack Water Co. v. Old Tappan Bor., 77 N.J. 208 (1978), our Supreme Court also addressed the highest and best use of land comprising a private water supply facility. However, the Court distinguished the assessment of a privately owned water supply facility, under N.J.S.A. 54:30A-32, from a municipally owned water supply facility, under N.J.S.A. 54:4-3.3. The Court held that the highest and best use of privately owned land located underwater is "as a reservoir in conjunction with the operation of a utility water system." Id. at 214. Although N.J.S.A. 54:4-3.3 prohibits the valuation of municipally owned water supply lands as an integrated water supply facility, the Court emphasized that no such prohibition exists under N.J.S.A. 54:30A-32.

   

notwithstanding the Livingston moratorium, which was of indeterminate duration." Id. at 47. The court determined that the "indefinite duration of the ban on sewer hookups for new residential construction precludes use of any part of the subject property for residential purposes." Id. at 47. Accordingly, it found that the highest and best use of the undevelopable land, "in its entirety is for open space/conservation." Id. at 48 (emphasis added).

In Jersey City, Div. of Water v. Parsippany-Troy Hills Twp., 16 N.J. Tax 504 (Tax 1997), the court similarly faced the valuation of 1,174 acres of municipally owned land used as a reservoir for the water supply of its residents. Approximately 710 acres of the land was submerged under approximately 7,300,000,000 gallons of water, with the balance of the land constituting wetlands, wetlands transition areas, and developable uplands. Id. at 507.

The court rejected the defendant's valuation of the underwater land for use as residential or office/laboratory development. Id. at 518. The court explained that "[t]he underwater condition of the subject land is permanent . . . [p]roperty having a highest and best use as a reservoir simply cannot be valued, as zoned, using comparable sales of developable uplands." Id. at 520. The court found that the "attempt by defendant's appraiser to [value it as developable vacant land] violates established principles of appraising." Ibid. Moreover, the court concluded that "[b]y valuing plaintiff's underwater lands as if they were dry, developable lands, the defendant has failed 'to distribute the tax burden of the taxing district equably between the municipality owning watershed lands and the lands of the other taxpayers of the district." Id. at 521 (quoting Newark v. West Milford Twp., 9 N.J. at 301). The court further emphasized that "[w]ater is not an 'improvement' and valuing land underwater as if the water does not exist, using comparable sales of dry upland denies reality." Ibid. Accordingly, the court concluded that the underwater land had "a highest






and best use, . . . for conservation and open space." Id. at 525 (emphasis added).

The court emphasizes that the highest and best use analysis is an investigation, interpretation, and "economic study of market forces focused on the subject property." The Appraisal of Real Estate, 305 (11th ed. 1996). As eloquently expressed by Judge Kuskin, the "[h]ighest and best use is a function of the market. 'An understanding of market behavior is essential to the concept of highest and best use.'" Jersey City, Div. of Water, 16 N.J. Tax at 519 (quoting The Appraisal of Real Estate at 297). Importantly, the concluded highest and best use must be reasonably and logically related to the property being evaluated and must take into consideration the constraints and encumbrances that impact its potential uses.

Although the motivations of a purchaser acquiring unencumbered land may play a role in defining a property's value in the marketplace, they are not necessarily reflective of its highest and best use. Land that is burdened by encumbrances or easements that specifically limit its potential uses and is maintained (or acquired) for purposes consistent with the restrictions on its use, should have a highest and best use that rationally accounts for and reflects those limitations.

Here, the subject property is burdened by the Conservation Easements requiring it be maintained "forever and predominantly in its natural forested condition." Moreover, the Conservation Easements impose the additional obligation on the subject property's owner to perpetually allow public access for passive recreational purposes. The highest and best use analysis must reflect the marketplace reaction to the practicalities that exist with the property being examined. As stated by our Supreme Court, a basic tenet of the property valuation processes is that the concluded highest and best use "should have some relationship to reality." Hackensack Water Co. v. Old Tappan, 77 N.J. 208, 2015 (1978). Due to the subject property's encumbrances






and restrictions, the reality is that it is useful and productive as undeveloped and naturally forested watershed affording public access for passive recreational activities.

After reviewing the Conservation Easements, the actual use of the subject property, and consulting with market participants, West Milford's valuation expert concluded that the subject property's highest and best use was for it to be held or maintained as open space with public access for passive recreational uses. The court finds this analysis and conclusion to be more credible, and consistent with our state's jurisprudence, the terms and conditions of the Conservation Easements, and Newark's actual use of the subject property during the tax years at issue.[43] Therefore, the

---

[43] The court finds Newark's valuation expert's opinion that, passive recreation cannot be the highest and best use of the subject property because the potential gross income generated from passive recreation operations is insufficient to pay all expenses, not credible. Cross-examination disclosed that in crafting his appraisal report and reaching his conclusion, Newark's valuation expert did not conduct a market evaluation of public permit fees from other passive recreation sites in New Jersey to ascertain whether the fees charged by Newark were representative of the market. It was only after his appraisal report was prepared and in preparation of trial, did he endeavor to conduct any market analysis of permit fees. Moreover, no evidence was presented that he performed any analysis of the potential number of daily visitors that the subject property could accommodate. In undertaking the income-capitalization approach, an appraiser is charged with determining a property's potential gross income. This requires an appraiser to discern "the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Vill. Apartments Co. v. Cranford Twp., 108 N.J. 266, 270 (1987). The term economic or market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." The Dictionary of Real Estate Appraisal, at 121-22. Here, by not ascertaining the economic or market rate for permit fees or an accurate number of potential daily visitors and permit purchasers, Newark's valuation expert's analysis of the subject property's capacity to generate income was materially flawed. In addition, Newark's valuation expert's analysis fails to account for the more than $27 million dollars consideration paid to Newark by the NJDEP to voluntarily impose these restrictions on the subject property. There was no suggestion or evidence offered during trial that Newark did not understand or failed to appreciate the gravity of the obligations it voluntarily agreed to undertake in granting the Conservation Easements on the subject property. Rather, Newark agreed to preserve the subject property in its natural forested state forever. Moreover, Newark undertook an obligation to afford the public a right of access, and to maintain trails on the subject property, while retaining the right to use and protect the source of drinking water for many






court accepts West Milford's valuation expert's conclusion of the subject property's highest and best use.

### D. Valuation methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Glen Rock Bor., 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (internal citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)).

Notably, in attempting to derive the true or market value of land encumbered by a conservation easement, our courts have endorsed a two-step analysis. First, the land must be valued free of any public rights, constraints, or restrictions, as a "marketable commodity." See Bolger Foundation, 104 N.J. at 342; Estate of Allison, 69 N.J. Super. 530-31. Second, after

---

of its residents. Thus, although the potential gross income that could be generated from the sale of public permits and the expenses associated with continuing to maintain the property was undoubtedly considered by Newark when entering in this transaction, so too would have been Newark's ability to further monetize the $27 million dollars it received from the grant of the Conservation Easements. Accordingly, the court does not find Newark's valuation expert's approach contemplates the entirety of the Conservation Easements transaction and provides a credible and meaningful reflection of the subject property's highest and best use.






determining the unimpeded land value, an adjustment must be formulated and applied to the unimpeded land value to account for the property rights that were conveyed or surrendered under the conservation easement.

In Ridgewood v. Bolger Foundation, 104 N.J. 337 (1986), the property owner, a private foundation, conveyed to the New Jersey Conservation Foundation, a nonprofit corporation dedicated to fostering and preserving open space, a "perpetual conservation easement" on its 2.8-acre tract of unimproved land. Id. at 338. The conservation easement "was granted for the benefit of the general public" and prohibited the foundation from engaging in any activity deemed "'detrimental to the preservation of the [p]roperty in its natural state.'" Ibid. The easement prevented the removal of vegetation, building of any structures, excavating soil, dumping refuse, or "engaging in any activity that might be detrimental to drainage, flood control, potable water, erosion control, or soil conservation." Ibid.

The Court criticized the taxing district's assessment and valuation of the land for development with single family residences, without making a concomitant reduction in the market value for the legal rights conveyed under the conservation easement. Rather, it endorsed the principle that real property subject to a conservation easement should be assessed and valued as a "marketable commodity," with a deduction then applied for the "elements of value [that] are surrendered by the taxpayer." Id. at 342.

Finding guidance under our state's jurisprudence, the Court declared that "the value of the easement should be deducted from the fair value of the land." Id. at 341 (citing Estate of Allison,






69 N.J. Super. 514) (emphasis added).[44]  Highlighting that the value of "a conservation easement given to [e]nsure the preservation of open space is fully comparable . . . [with] its recognition for tax valuation purposes," the Court expressed that "the adverse impact of such an encumbrance on market value must be taken into account in arriving at an assessed valuation."  Id. at 342.

Recognizing that New Jersey has a long-standing policy "of granting relief from property tax assessments to encourage the preservation of open space and conserving natural resources," the Court stressed that "[t]he public benefits flowing from such a conservation easement [to ensure the preservation of open space and] are beyond debate. . . ."  Id. at 341.  Importantly, the Court found instructive, the declaration contained under the New Jersey Conservation Restriction and Historic Preservation Restriction Act, stating that "[t]he existence of any conservation restriction . . . acquired pursuant to this act shall be considered by local assessors in establishing the full value of any lands subject to such restriction.'"  Ibid. (citing N.J.S.A. 13:8B-7).

Similarly, in Englewood Cliffs v. Estate of Allison, the decedent devised a 7.808-acre tract of land to the trustees of a charitable trust created under his will, to be maintained and developed as a public park with footpaths, benches, parking, and landscaping.  69 N.J. Super. at 516.  The trustees challenged the assessed value of the property and the county board of taxation set aside the property's tax assessment.

Upon review before the New Jersey Division of Tax Appeals, the taxing district's expert

---

[44]  The Internal Revenue Service similarly recognizes that a conservation easement will negatively impact the value of encumbered property and applies a "before-and-after" approach to determine the true or market value of the property that is subject to the conservation easement.  In sum, this approach involves valuation of the property both prior to, and after, the grant of the easement to calculate the value of the conservation easement.  See Thayer v. Commissioner, 36 T.C.M. 1504 (1977); Stanley Works and Subsidiaries v. Commissioner, 87 T.C. 389 (1986); Symington v. Commissioner, 87 T.C. 892 (1986).






valued the property "as though it were an ordinary piece of commercial property available for sale free of restrictions," Id. at 519, despite having acknowledged that the property was "dedicated to public use and can only be used for public purposes." Id. at 524. The New Jersey Division of Tax Appeals reversed the county board judgment and restored the property's tax assessment.

The Appellate Division reversed the judgment of the New Jersey Division of Tax Appeals finding that "the property assessed, because of the restrictions upon its use, has only a small fraction of the money value it would have if unrestricted." Id. at 524. The court observed that "[t]he burden of the easement [to maintain the property as a park] is an element of value to be subtracted when making the assessment." Id. at 526. The court reasoned that "it is immaterial for assessment purposes whether the fee owner holds title subject to a private easement for the benefit of a dominant tenement, a public easement in a dedicated and accepted street, or public rights to use and enjoy a park under a charitable trust. In each case the land has been deprived of an element of value to be subtracted from the [market] value of the fee." Id. at 529 (emphasis added).

Therefore, the property's tax assessment "should not include elements of value . . . transferred to the community at large in the form of public rights." Ibid. Rather, to arrive at the correct local property tax assessment, the court accepted the taxing district's market value of the property free of the public easement. The Appellate Division found that the fair market value of property held by a private testamentary charitable trust as a public park, should be valued "free of public rights . . . conclud[ing] that the public rights represent nine-tenths of [the] total value . . . [s]ubtracting that sum [from the market value] leav[ing] a residue of value," which the court found to be the true value of the encumbered property. 69 N.J. Super. at 530-31 (emphasis added).

Here, despite the subject property being burdened by the Conservation Easements, neither






Newark's valuation expert nor West Milford's valuation expert offered any meaningful evidence providing the market value of the subject property's fee simple interest free from the restrictions under the Conservation Easements.[45] Although it was undisputed during trial that there are areas of the subject property that are flat, bordered by roadways, and have access to public utility service, and thus, are developable, no evidence or analysis was produced demonstrating what the "fair value" was of the subject property without the Conservation Easements constraints. Bolger Foundation, 104 N.J. at 341 (citing Estate of Allison, 69 N.J. Super. 514). In sum, no credible evidence was offered during trial deriving the fair market value for the subject property as developable and unencumbered by the Conservation Easements as instructed by the courts in Bolger Foundation and Estate of Allison. Therefore, the court finds that the valuation methods embraced by Newark's valuation expert and West Milford's valuation expert were materially flawed and of little usefulness in assisting the court to determine the subject property's true or market value.

However, the court is mindful that it is tasked with attempting to determine the true or market value of the subject property based on the competent evidence presented during trial. "It is the court's obligation to apply its judgment to the valuation data . . . and to ascertain and determine the true value of the subject provided there is enough substantial and competent

---

[45] West Milford's valuation expert identified ten land sales that he opined were comparable to the subject property. However, West Milford's valuation expert did not value the subject property as developable land free from the Conservation Easements and then make a deduction for the value of the public rights conveyed under the Conservation Easement. Rather, he opined that the land sales all contained similar "physical restrictions" and "legal restrictions." In his opinion, the Conservation Easements are "only one of multiple constraints on the subject [property]." After consulting an "Easement Valuation [Matrix]" table, he concluded that due to the lack of a "legally binding impact" effecting the ten land sales, only a 10% downward adjustment was necessary, which the table characterized as having "nominal effect on use and utility."

   

evidence to enable the trier of the facts to determine true value." Inmar Associates, 2 N.J. Tax at 66 (citing Samuel Hird & Sons, Inc. v. Garfield, 87 N.J. Super. 65, 74 (App. Div. 1964)). As articulated by Justice Garibaldi, the "Tax Court has not only the right, but the duty to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question." Glen Wall Assocs. v. Twp. of Wall, 99, N.J. 265, 280 (1985) (citing New Cumberland Corp. v. Roselle, 3 N.J. Tax 345, 353 (1981)).

In fulfilling that fundamental obligation, the court must analyze "what appropriate marketable segments thereof, analogous to private holdings of similar lands by others in the community would sell for in the aggregate if sold separately . . . under private contract." Appeal of East Orange, 80 N.J. Super. 219, 232 (App. Div. 1963)(citing Newark v. West Milford Twp., 9 N.J. 295 (1952)). Accordingly, notwithstanding the notable flaws identified above, the court will analyze the market-based evidence presented during trial to discern if any credible data exists from which the court may determine the subject property's true or market value.

1. Newark's valuation expert

Here, Newark's valuation expert applied the "extraordinary assumption" that "cutting [fire]wood for sale is [legally permissible and] financially feasible."[46] After consulting with a

---

[46] Rule 1-2 of the Uniform Standards of Professional Appraisal Practice permits an appraiser to employ and "identify any extraordinary assumption necessary in the assignment." Dennis S. Tosh and William B. Rayburn, Uniform Standards of Professional Appraisal Practice (8th ed. 2001). The comments to Rule 1-2 make clear that an extraordinary assumption may employed only if: "it is required to properly develop credible opinions and conclusions; the appraiser has a reasonable basis for the extraordinary assumption; use of the extraordinary assumption results in a credible analysis; and the appraiser complies with the disclosure requirements." Ibid. However, an extraordinary assumption cannot impart a projected use on a property that is neither legally permissible nor reasonably probable. A fundamental "prerequisite" of the highest and best use analysis requires a "probability of achievement. The projected use cannot be remote, speculative or conjectural." Inmar Assocs. Inc., 2 N.J. Tax 65 (Tax 1980). The appraiser must offer credible






forester to discern the estimated cost associated with a woodlands management plan, Newark's

valuation expert consulted the New Jersey's Farmland Evaluation Committee's (the "Committee")

published tables of values for non-appurtenant woodland, or what he characterized was "land that

qualifies for farmland assessment but is not part of an otherwise qualified farm." In Newark's

valuation expert's opinion, the subject property would have a "Group B" soil rating classification.

Therefore, he adopted the Committee's annual published values for non-appurtenant woodlands

qualifying as farmland having a "Group B" soil rating, which ranged from $150 to $158 per acre,

during the tax years at issue, to value the subject property's 16,485 acres of land.

However, the court does not find Newark's valuation expert's approach to be a credible

method for deriving the subject property's true or market value. Our courts have expressly rejected

the notion that watershed property should be assessed, and correspondingly valued, in the same

manner as farmland.

The New Jersey Farmland Assessment Act of 1964 (the "Farmland Assessment Act"),

N.J.S.A. 54:4-23.1 to -34, permits farmland and woodland acres actively devoted to an agricultural

use or horticultural use to be assessed and taxed at a reduced rate. One of the primary objectives

---

evidence demonstrating a reasonable probability exists for the proposed use to be achieved. The
proposed use must "reflect[] a reasonable expectation in the near future." Hackensack Water Co.
v. Haworth, 178 N.J. Super. 251, 259 (App. Div. 1981). Here, Newark's valuation expert offered
no evidence that the growth and sale of firewood for off-premises use is legally permissible or that
it was reasonably probable to be permitted by the NJDEP. Rather, the trial record disclosed that
the Conservation Easements expressly limit the cutting of firewood on the subject property for
"on-site domestic purposes" only. During trial, no evidence was presented that any inquiry was
made to the NJDEP to ascertain whether the cutting of firewood for off-premises use would be
allowed under the Conservation Easement. Accordingly, the court finds Newark's valuation
expert's use of an extraordinary assumption in this matter to be inconsistent with Rule 1-2 of the
Uniform Standards of Professional Appraisal Practice, requiring a reasonable basis for the
extraordinary assumption and a credible analysis that supports the conclusion of value.






of the New Jersey Constitution of 1947, N.J. Const. art. VIII, § I, ¶ 1(b), and the Farmland

Assessment Act was "to save the family farm and to provide farmers with some economic relief

by permitting farmland to be taxed at a lower assessment." Jackson Twp. v. Hamburger, 2 N.J.

Tax. 430, 437 (Tax 1981) (citing Urban Farms, Inc. v. Wayne Twp., 159 N.J. Super. 61, 67 (App.

Div. 1978)).

To qualify as farmland, land must meet certain eligibility requirements. These criteria

include that, (i) the land must be devoted to an agricultural and/or horticultural use for the two

years prior to the year of application; (ii) the land must be a minimum of five contiguous acres

being farmed or under a woodland management plan; (iii) for woodland managed property, the

gross sales of products must average $500 per year for the first five acres, plus $0.50 per acre for

any acreage more than five acres; and (iv) the owner must represent that the land will remain

devoted for agricultural or horticultural products for the entire tax year. See N.J.S.A. 54:4-23.5;

N.J.S.A. 54:4-23.6.

The Farmland Assessment Act created the New Jersey Farmland Evaluation Advisory

Committee. See N.J.S.A. 54:4-23.20. One of the primary functions and responsibilities of the

Committee includes,

> annually determin[ing] and publish[ing] a range of values for each
> of the several classifications of land in agricultural and horticultural
> use in the various areas of the State. The committee shall determine
> the ranges in fair value of such land based upon its productive
> capabilities when devoted to agricultural or horticultural uses . . . On
> or before October 1 of each year, the committee shall make these
> ranges of fair value available to the assessing authority in each of
> the taxing districts in which land in agricultural and horticultural use
> is located.
>
> [N.J.S.A. 54:4-23.20 (emphasis added).]






Thus, the Committee promulgates guidelines to assist municipal tax assessors in valuing land that is devoted to agricultural and horticultural uses under the Farmland Assessment Act.[47] Importantly, those declared ranges in value are predicated upon the land's productive capabilities for agricultural or horticultural use. In accomplishing its statutory responsibilities, the Committee "established five use classes of farmland, namely, cropland harvested, cropland pastured, permanent pasture, non-appurtenant woodland, and appurtenant woodland. The Committee also established five soil groups relating to the 'innate productivity of the soils.'" Van Vugt v. Pequannock Twp., 20 N.J. Tax 129, 133 (Tax 2002) (citing State of New Jersey, 35th Report of State Farmland Evaluation Advisory Committee, Productivity Values for 1999 Tax Year 2 (Oct. 1998)).

N.J.A.C. 18:15-1.1 defines non-appurtenant woodland as,

> woodland that is neither supported nor subordinate to other farmland and which can only qualify for farmland assessment on the basis of being in compliance with a woodland management plan filed with the Department of Environmental Protection. Non-appurtenant woodland is actively devoted to the production for sale of tree and forest products.
>
> [N.J.A.C. 18:15-1.1 (emphasis added).]

Thus, non-appurtenant woodland is land that qualifies as farmland and is governed by a woodland management plan providing tree and forest products for sale. Accordingly, to qualify as non-appurtenant woodland, the land must comply with a woodland management plan filed with

---

[47] The regulations promulgated by the Director of the New Jersey Division of Taxation recommend that tax assessors use the valuation guidelines adopted by the Committee. N.J.A.C. 18:15-14.6(a). However, if a tax assessor elects not to use those valuation guidelines, the assessor "shall submit such alternate standards to the Director by November 1 of the pretax year." N.J.A.C. 18:14-14.6(b).






the NJDEP. See also N.J.S.A. 54:4-23.3 (requiring woodland management plans).

In City of East Orange v. Livingston Twp., 102 N.J. Super. 512 (Law. Div. 1968), aff'd o.b., 54 N.J. 96 (1968), East Orange's argued that its 2,500 acres of water reserve property should be valued and taxed as farmland under the Farmland Assessment Act of 1964, L. 1964, c. 48, N.J.S.A. 54:4-23.1 to –34. It asserted that the property qualified for farmland taxation and valuation because portions of the water reserve were being used for the sale of hay, timber, and firewood. Justice Handler (then Judge Handler), flatly rejected East Orange's contentions, observing that real property being used "'for the protection of a public water supply' are specifically taxable under N.J.S.A. 54:4-3.3." Id. at 529. The court highlighted that under N.J.S.A. 54:4-3.3, "municipally[-]owned watershed lands have long been the subject of special tax treatment." Ibid. He found that since 1905, the property had been consistently "used for the purpose for which [it was] originally acquired, namely, 'for the purpose and for the protection of a public water supply.'" Ibid. Justice Handler remarked that, "any other uses of or activities upon said properties [the sale of hay, timber, and lumber] are merely incidental to the use of the land as watershed." Ibid.

After analyzing the origins and purposes of the Farmland Assessment Act, the court declined to interpret N.J.S.A. 54:4-3.3 as being "substantially repealed by the . . . enactment of the Farmland Assessment Act of 1964." Id. at 530. Justice Handler found that a "construction of the [Farmland Assessment Act in a manner] that would produc[e] this result cannot be easily indulged." Ibid. Rather, he keenly observed that nothing in the "statutory history of the Farmland Assessment Act of 1964 belies an intent on the part of the Legislature to deal in any way with municipal watershed lands or to subject such land to taxation as farmland." Id. at 531. In sum, he






found that "the Legislature by its enactment of the Farmland Assessment Act of 1964, did not intend to treat in any way or to confer any special, different, or new tax status upon municipally owned water sheds." Id. at 535 (emphasis added). Therefore, the court concluded that the Farmland Assessment Act of 1964 . . . has no application to municipal lands actually used 'for the purpose and for the protection of a public water supply' and [are] otherwise taxable under N.J.S.A. 54:4-3.3" Id. at 535.

In affirming Justice Handler's opinion, our Supreme Court succinctly stated that, "[t]he judgment is affirmed essentially for the reasons given by the trial court." 54 N.J. at 97.[48] Moreover, because East Orange solely argued the issue of application of the Farmland Assessment Act before the trial court, the Court stated that "[w]e agree also with the trial court that the matter of valuation under the statute dealing with local taxation of water reserve lands, N.J.S.A. 54:4-3.3," was not presented and therefore, declined to address it. Ibid.

Accordingly, the court finds the approach employed by Newark's valuation expert, valuing the subject property as non-appurtenant woodlands qualifying as farmland is expressly contrary to our state's jurisprudence. Our statutes dictate that municipally owned watershed property must be assessed and valued in the same manner as private lands, under N.J.S.A. 54:4-3.3. See Newark City v. West Milford Twp., 9 N.J. 295 (1952); In Appeal of East Orange, 80 N.J. Super. 219, 229 (App. Div. 1963). Because the Farmland Assessment Act did not confer on municipally owned watersheds the ability to qualify as farmland, it is inappropriate to attempt to derive the value of a municipally owned watershed from the published farmland qualified valuation rates. Accordingly,

---

[48] The New Jersey Supreme Court certified the City of East Orange's appeal for review before argument was presented to the Appellate Division.

   

for the foregoing reasons the court rejects Newark's valuation expert's concluded value for the subject property.

2.     <u>West Milford's evidence</u>

West Milford's valuation expert derived a value of the subject property as open space under a market driven or sales comparison approach. Based, in part, on his discussions with Mr. Pinto, as well as an examination of land sales in New Jersey, he concluded that a market exists for land dedicated for use as open space and/or passive recreation. Accordingly, the court will first address the testimony and evidence elicited from Mr. Pinto, which served as a foundation of West Milford's valuation expert's report and opinions.

a.     <u>West Milford's land conservation and land preservation expert</u>

In support of his conclusion that a market exists for the subject property, Mr. Pinto expressed that,

> there are several different potential operators or owners of this piece, one being a private individual who would want to keep the property for their own hunting purposes. Yes, they would need to provide public access, but . . . [t]here could be a restriction on where the public is permitted [access to] in that scenario. There are higher institutions [of learning], for example, Yale University has a School of Forestry. There are other Schools of Forestry in various colleges. . . . The opportunity to acquire 16,000 . . . acres for forestry studies, research. That's attractive. There -- there's a market there. There's also a new market happening among public corporations under ESG, environmental, social, and governance matters, where they're trying to show that their public corporation is . . . environmentally responsible, carbon-neutral entity, and they will acquire properties for that purpose. There's also now a Carbon Sequestration Program that's coming along. It's in its infancy, but it's there as well.

According to Mr. Pinto, "in New Jersey, . . . there are purchasers of these lands, and . . . there is a market for lands, even lands that are restricted from having any development. . . ." In






his opinion, "there is a market for the property if Newark were to try to sell the property . . . [a]s open space."

Notably, in reaching this conclusion, Mr. Pinto testified that he reviewed sixteen applications from his time in the office of the Morris County Preservation Trust Fund that, he characterized as "really had no development potential to them. Most of them were restricted by either wetlands . . . or legal access to the properties. That's very often how they were encumbered." These transactions involved municipalities or county agencies acquiring land, which upon acquisition were dedicated as open space to afford public access and for passive recreational activities.[49] Notably, Mr. Pinto testified that, "[i]n Newark's case, <u>there is a specific conservation easement because . . . the lands are developable otherwise . . . they're not physically constrained the way these [other sixteen] properties are physically constrained</u>." (emphasis added). Importantly however, Mr. Pinto could not identify any transaction where land was restricted and dedicated for use as open space prior to it being acquired by the county or municipality.

Thus, the court finds that Mr. Pinto's testimony supports the premise that in New Jersey, a market exists for unencumbered land to be dedicated, upon acquisition, for use as open space. However, the court does not find that Mr. Pinto's testimony demonstrates a market exists for property already burdened by conservation easements that restrict its uses. Moreover, his testimony offers no meaningful insight into what the value is of that burdened land, per acre. In sum, Mr. Pinto's testimony does not assist the court in determining the unencumbered value of the

---

[49] However, Mr. Pinto's report made only a fleeting reference to these transactions as "our familiarity with Open Space transactions for the time period in question." His report did not identify the properties involved, did not identify the seller or buyer of these properties, did not supply the date these sales were consummated, and offered no details about each real estate transaction.






subject property as a "marketable commodity." It provides no meaningful guidance to the court to ascertain the "elements of value [that] are surrendered by the taxpayer," and consequently, the adjustment necessary to account for the presence of a conservation easement on land. Bolger Foundation, 104 N.J. at 342.

### b. West Milford's valuation expert

To determine the subject property's true or market value, West Milford's valuation expert relied on ten land sales that sold between October 2012 and October 2020. Two land sales were in Passaic County, and the remaining eight land sales were in Morris County. The unadjusted sale prices of the ten sales ranged from $3,410 to $7,056, per acre. West Milford's valuation expert applied market condition (time) adjustments ranging from -6% to 17%,[50] and access/exposure adjustments ranging from 0% to 5%, during the tax years at issue.

After applying his adjustments, the adjusted sale prices of the ten land sale transactions ranged from: (i) $3,545 to $7,261, per acre, for the 2014 tax year; (ii) $3,616 to $7,409, per acre, for the 2015 tax year; (iii) $3,688 to $7,557, per acre, for the 2016 tax year; (iv) $3,831 to $7,853, per acre, for the 2018 tax year; (v) $3,903 to $8,002, per acre, for the 2019 tax year; (vi) $3,974 to $8,150, per acre, for the 2020 tax year; and (vii) $4,046 to $8,372, per acre, for the 2021 tax year. After analyzing the sales data, West Milford's valuation expert determined that a $5,500, per acre

---

[50] West Milford's valuation expert explained that he reviewed a "ratio study" for West Milford Township. The study apparently revealed that between 2014 and 2021, "it was roughly a 2% time adjustment, per year." However, West Milford's valuation expert stated that he did not apply a fixed 2% time adjustment to each land sale for each remote tax year. Rather, he testified that he "took a step back, . . . bracketed my sales and thought that my ultimate conclusion was reasonable for each of my tax years. But I did utilize the 2% time adjustment to either apply an upward adjustment or apply downward adjustment depending on the tax year and which October 1st it fell on, just from a valuation standpoint."






land value was reasonable.

Next, West Milford's valuation expert applied a 10% downward adjustment, or $550 per acre, to reflect what he characterized was "the 90% of rights retained by the fee [simple] holder" or, Newark in this matter. Stated differently, West Milford's valuation expert opined that after imposing the Conservation Easements, Newark retained 90% of the fee simple interest in the subject property. Moreover, in his opinion, the land sales all contained similar "physical restrictions" and "legal restrictions" as the subject property. In his estimation, the Conservation Easements amount to "only one of multiple constraints on the subject [property] that restricts the highest and best use to passive recreation." In addition, after consulting an "Easement Valuation Matrix" table,[51] he concluded that due to the lack of a "legally binding impact" affecting the ten land sales, only a 10% downward adjustment was necessary. The "Easement Valuation Matrix" categorized the 10% fee interest as having "nominal effect on use and utility."

Accordingly, West Milford's expert concluded an overall value of $5,000 per acre, should be attributed to the subject property. In sum, he concluded that the subject property had a true or market value of $82,400,000 ($5,000 x 16,485-acres), as of each valuation date at issue.

The sales comparison approach arrives at a true or market value "by comparing properties similar to the subject property that have recently sold, are listed for sale, or are under contract." The Appraisal of Real Estate, 377 (14th ed. 2013). This approach involves a "comparative analysis of properties" and requires the valuation expert to focus on the "similarities and differences that affect value . . . which may include variations in property rights, financing, terms, market conditions and physical characteristics." Id. at 378. "When data is available, this [approach] is

---

[51] Donald Sherwood, Easement Valuation, Right of Way Magazine 33 (May/June 2006)

   

the most straight forward and simple way to explain and support an opinion of market value."
Greenblatt v. Englewood City, 26 N.J. Tax 41, 53 (Tax 2010) (citing The Appraisal of Real Estate,
300 (13th ed. 2008)).  Notably, when engaging in the sales comparison approach, "[p]otentially
comparable properties that do not have the same highest and best use are usually eliminated from
further analysis."  The Appraisal of Real Estate, at 139 (13th ed. 2008).

During trial, West Milford's valuation expert candidly admitted that "none of [the ten land
sales] had an [conservation] easement."  Moreover, he further acknowledged that "none [of the ten
land sales] had constraints as far as the Watershed Moratorium Act or a conservation easement."
Rather, he opined that because each land sale was in the Highlands Preservation Act area and
possessed similar topography or "physical constraints," those factors rendered each of the land
sales undevelopable comparable to the subject property.  In his estimation, "between the legal
restrictions [under the Highlands Preservation Act] and the physical restrictions, that's the
comparability."

However, the court finds West Milford's valuation expert's attempt to equate and/or
compare the restrictions under the Conservation Easements with the topographical challenges and
controls imposed under the Highlands Preservation Act are misplaced, rendering most of his land
sales of dubious usefulness.

The court emphasizes that an important distinction must be made between the gravity of
the restrictions addressed herein.  In general, conservation easements, the Highlands Preservation
Act, and the Watershed Protection Act each impose certain controls on development of a property.
However, the Highlands Preservation Act and the Watershed Protection Act do not expressly
prohibit any uses of a property, nor do they dictate what a property must be used for.  Rather, they






place limitations on development, the scope of development permitted, and restrictions on the sale

of a property.[52]   In stark contrast, the Conservation Easements impose permanent restrictions

mandating what the subject property must be used for, what the subject property cannot be used

for, and further obligate the subject property's owner to afford public access, while offering no

means of potential administrative relief from those restrictions.

Importantly, during trial West Milford's valuation expert acknowledged that the Highlands

Preservation Act, "allows limited development" and that Highlands Preservation Act and the

Watershed Moratorium Act only diminish "some of our [development] rights." According to West

Milford's valuation expert,

> before the encumbrance of the conservation easement, we have
> essentially a hundred percent of our rights, <u>other than the fact that
> some of our rights are diminished because of the various restrictions
> with the Highlands [Preservation Act] and the Watershed
> Moratorium Act</u>.  But now there's a further easement, a further
> restriction on the total bundle of rights. (emphasis added).

---

[52]  The Highlands Preservation Act contains "exemption provisions . . . allowing construction of a single[-]family dwelling on each lot, any improvement to a single[-]family dwelling including an addition, garage, or shed, and harvesting of forest products in accordance with an approved forest management plan."  Cty. of Warren v. State, 409 N.J. Super. 495, 511 (App. Div. 2009) (citing N.J.S.A. 13:20-28(a)(1), (2), (5), (7)).  Under its express terms, the Highlands Preservation Act, exempts "a major Highlands development . . . that on or before March 29, 2004 has been the subject of a settlement agreement and stipulation of dismissal filed in the Superior Court," that satisfies the municipality's fair share development obligations."   N.J.S.A. 13:20-28(a)(17). Moreover, the Highlands Preservation Act affords parties the "opportunity to seek waivers under the Highlands Act to the extent they consider the Act's impact to constitute a taking of their property."  Ibid. (citing OFP, L.L.C. v. State, 395 N.J. Super. 571, 584-87 (App. Div. 2007)).  In addition, P.L. 1990, c. 19 § 1, authorized the NJDEP to promulgate "rules and regulations establishing buffer zones for all watershed lands associated with public water supply reservoirs for the purpose of protecting drinking water quality."  In re Hackensack Water Co., 249 N.J. Super. 164, 170 (App. Div 1991); see also N.J.A.C. 7:38-1.1 (affording the NJDEP with the authority to "review any application pursuant to the Highlands [Preservation] Act, for . . . development proposed in the preservation area of the Highlands Region, for a waiver from any requirement for a Highlands Preservation Area Approval, any . . . applicability determination or exemption from the Act. . . .")

   

Thus, during trial, West Milford's valuation expert recognized that a distinction must be made between the constraints imposed under the Conservation Easements, and the restrictions under the Highlands Preservation Act and the Watershed Moratorium Act.

In addition, Newark's valuation expert similarly observed that the "Watershed [Protection] Act prevents any development of the property or sale of the property without going . . . through a whole process with the State of New Jersey to authorize it." Newark's valuation expert further expressed that "in this particular case, we have even more restrictions . . . , that the Conservation Easement[s are] even more restrictive than the Watershed Moratorium Act. . . ." Newark's valuation expert's appraisal report similarly states that "all Major Highlands Development, as defined by the Act, requires approval of the New Jersey Department of Environmental Protection," thus, implicitly acknowledging that certain development is permitted under the Highlands Preservation Act.

However, as of each valuation date involved herein, any prospective purchaser of the subject property would be faced with the simple understanding that because of the Conservation Easements, any development of the subject property was impossible and forever barred. No amount of excavation, labor, assemblage with adjacent properties, planning, or administrative petitioning would allow any development to ever occur on the subject property.

Additionally, the Conservation Easements impose an affirmative obligation on the subject property's owner to afford the public access, in perpetuity. Conversely, there is no requirement or obligation under the Highlands Preservation Act for a property owner to permit members of the public a right of access to private lands. This material distinction was not accounted for at all by West Milford's valuation expert.

   

Further, in West Milford's valuation expert's opinion, eight of the land sales possessed "physical restrictions" because they were "land locked" or had only "limited access." He reasoned that these "physical restrictions" were analogous to the legal restrictions imposed on the subject property under the Conservation Easements. However, West Milford's valuation expert offered no market data, analysis, or information supporting such conclusion. Moreover, no testimony, evidence, or analysis was offered by West Milford's valuation expert whether any of these property owners had acquired an easement by necessity. See Ghen v. Piasecki, 172 N.J. Super. 35, 41 (App. Div. 1980) (stating that a "way [or easement] of necessity arises where there has been unity of ownership and a subsequent severance of title resulting in the grantor or grantee owning a parcel which is landlocked"). Thus, absent credible data or analysis supporting his conclusion, the court is unwilling to afford it any weight.

Here, the court finds that the Conservation Easements present a more debilitating and constraining encumbrance on the subject property, than do the restrictions imposed under the Highlands Preservation Act or Watershed Moratorium Act. Moreover, the court further finds West Milford's valuation expert's attempt to characterize the Highlands Preservation Act controls as being equivalent to the Conservation Easements restrictions are misguided. West Milford's valuation expert's attempt to portray the "physical restrictions" as being analogous to the Conservation Easements lacks support. In sum, the court concludes that West Milford's valuation expert's land sales 1, 2, 3, 4, 6, 7, 8, 9, and 10, are not comparable with the subject property or competitive in the marketplace with the subject property and therefore accord them no weight.[53]

---

[53] Effective cross-examination disclosed that none of the land sales were exposed to an open and competitive market. Rather, the buyers (government agencies and non-profit conservation groups), directly approached and entered in contracts with the property owners. Notably, the






However, following our Supreme Court's guidance under Newark City v. West Milford Twp., that the true or market value of watershed property should be determined "by comparison of the representative component parts . . . with the true value of comparable parcels of land owned by private persons adjacent to the watershed," the court analyzes West Milford's valuation expert's land sale 5. 9 N.J. at 308.

Land sale 5 comprises a 58.51-acre tract of land in West Milford sold on May 21, 2014, for consideration of $199,500, or $3,410 per acre. Significantly, West Milford's valuation expert testified that this land sale was a "donut hole" in the middle of the subject property. Thus, land sale 5 was surrounded entirely by the subject property, did not have a means of vehicular egress or access, and had no access to utility services.

Accordingly, although no recorded easement was imposed on land sale 5, the court finds that its sale price was inherently impacted and influenced by the Conservation Easements at issue. The property's owner had no means of access to their property (other than by air or hiking across the subject property), could not acquire any property adjacent to their property for purposes of gaining access or enabling development, and could not acquire an easement across the subject property to provide access to their property because the Conservation Easements expressly prohibit

---

Green Acres program provided grants to fund acquisition of the properties, enabling them to be acquired without traditional lender mortgage financing. Although West Milford's valuation expert testified that he was retained to prepare appraisal reports in connection with the acquisition of eight of the land sale transactions, he offered little insight into the seller's motivations, the exposure of these properties to an open and competitive market, and what influence, if any, did the Green Acres program funding have on their purchase price. See Venture 17, LLC v. Borough of Hasbrouck Heights, 27 N.J. Tax 108, 126 (Tax 2013); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 94 (Tax 1996)).

It is incumbent upon an appraiser employing the sales comparison approach to closely examine, analyze, and scrutinize the transaction. An appraiser must conduct a thorough investigation of the transaction to ascertain if it was affected by special factors, agreements, or considerations.






any roads from being constructed.[54]

Moreover, according to West Milford's valuation expert, land sale 5 possesses similar physical characteristics and topography to the subject property, with steep slopes and dense woodlands. In addition, like the subject property, land sale 5 is subject to the Highlands Preservation Act. Therefore, land sale 5 comprises the "representative component parts" required by our Supreme Court for proper value comparison. Newark City v. West Milford Twp., 9 N.J. at 308.

Next, turning to the adjustments applied by West Milford's valuation expert, it is well-settled that "[a]djustments must have a foundation obtained from market-derived sources or objective data and not be based on subjective observations and/or personal experience." VBV Realty, LLC v. Scotch Plains Twp., 29 N.J. Tax 548, 571 (Tax 2017). An appraiser's adjustments "must have a foundation obtained from the market. . . ." Greenblatt, 26 N.J. Tax at 55. "[T]he opinion of an expert depends upon the facts and reasoning which form the basis of the opinion. Without explanation as to the basis, the opinion of the expert is entitled to little weight in this regard." Id. at 55.

West Milford's valuation expert offered credible testimony supporting his review and analysis of a ratio study from "the first year through the last year" of the tax years at issue to support his time/market condition adjustments. The court finds the ratio study offers reasonable market support for time/market condition adjustments. Therefore, the court accepts all but one of

---

[54] No evidence was presented that the sellers of comparable land sale 5, or their predecessors in title, were the former owner of a parcel that now comprises the subject property, thus potentially affording the seller an easement by necessity. See Ghen, 172 N.J. Super. at 41(stating that a "way of necessity arises where there has been unity of ownership and a subsequent severance of title resulting in the grantor or grantee owning a parcel which is landlocked.")






West Milford's valuation expert's time/market condition adjustments.[55] Applying the time/market condition adjustments results in an indicated price, per acre, for land sale 5 of: (i) $3,376, for the 2014 tax year; (ii) $3,410, for the 2015 tax year; (iii) $3,512, for the 2016 tax year; (iv) $3,649, for the 2018 tax year; (v) $3,717, for the 2019 tax year; (vi) $3,785, for the 2020 tax year; and (vii) $3,853, for the 2021 tax year.

However, the court must reject West Milford's valuation expert's lack of access/exposure adjustment. Candidly, West Milford's valuation expert admitted during trial that, "I struggled with this adjustment." West Milford's valuation expert offered no objective or market derived data, or analysis demonstrating how he arrived at his adjustment. No evidence was presented during trial demonstrating that his adjustment accurately accounts for the lack of access to a property. Thus, the court was unable to gauge the accuracy and reliability of such adjustment in the market.

West Milford's valuation expert applied a 10% downward adjustment to account for the lack of a recorded easement on land sale 5. The court recognizes that our Supreme Court has instructed trial courts to "deduct[] from the fair value of the land," the value of the easement. Bolger Foundation, 104 N.J. at 341. The easement value should be "based on the difference between the value of the whole property before (or without) the easement and the value of the property with the easement in place." Sherwood, Easement Valuation, at 31.

Here, the court was not presented with any evidence of the unencumbered value of the subject property or the value of the Conservation Easement. However, the court finds from the

---

[55] The court rejects West Milford's valuation expert's upwards time/market condition adjustment to land sale 5 for the 2015 tax year as it sold on May 21, 2014, only 133 days prior to the October 1, 2014 valuation date. The court finds no time/market condition adjustment is warranted for the 2015 tax year.






evidence presented that the market value of land sale 5 was inherently negatively impacted by the Conservation Easements, because land sale 5 was a "donut hole" surrounded by the subject property. Thus, the court agrees that a nominal downward adjustment was necessary to account for the formal recording of a legal restriction against the title for land sale 5. Therefore, the court accepts West Milford's valuation expert's 10% downward adjustment to account for the recording of such easement.[56]

Importantly, the court finds that West Milford's valuation expert's 10% downward adjustment accounts for only a portion of the effect and impact of the Conservation Easements on the subject property. During trial, West Milford's valuation expert emphasized that the act of preserving land in its natural state must be distinguished from affording public access to land for passive recreational purposes. In his opinion, "I don't think that if land is preserved, it has to be open to the public." He explained that land can be preserved as open space in its natural undeveloped state, without incurring the concomitant obligation to provide public access. In his opinion, "I'm not sure how the preservation [of land] and [land being] open to the public correlate."

Here, the Conservation Easements not only preserve the subject property as open space but impose the additional obligation to afford the public a right of access. Therefore, the court finds that it must segregate and separately account for these different burdens imposed on the subject property under the Conservation Easements.

Under the Conservation Easements, Newark has assumed the additional obligation of

---

[56] The court acknowledges that when presented with evidence of the unencumbered fair market value of land, a more substantial adjustment would likely be required to account for all the "elements of value" that have been transferred. Estate of Allison, 69 N.J. Super. at 529; see also Sherwood, Easement Valuation, at 31.






affording the public access to the subject property for passive recreational purposes, in perpetuity. Newark agreed to "allow public access," "allow[] pedestrian access along existing and currently utilized interior trails," and to "allow [access] for public hunting and fishing." This permanent commitment to provide access to the subject property constitutes an additional diminishment of Newark's rights in the subject property. Importantly, "one key question [facing the appraiser's valuation of the easement] is will the easement affect the use and/or utility of the property. . . ." Sherwood, Easement Valuation, at 33. When an easement impacts the use of the surface area of land, it "tends to affect value to a greater degree compared to a subsurface easement where there is little or no impact on the surface use." Ibid.

Accordingly, after reviewing the "Easement Valuation Matrix" table relied on by West Milford's valuation expert and the separate and distinct categories of easements that account for the easements impact on a property, the court finds that an additional 15% downward adjustment is reasonable and necessary to accurately account for the conveyance by Newark to NJDEP of the ingress/egress rights afforded the public to the subject property under the Conservation Easements.

After applying West Milford's valuation expert's 10% downward adjustment for lack of a recorded easement and the court's 15% downward adjustment for Newark's assumption of the obligation to afford public access to the subject property, results in an adjusted price, per acre, for land sale 5 of: (i) $2,532, per acre, for the 2014 tax year; (ii) $2,558, per acre, for the 2015 tax year; (iii) $2,634, per acre, for the 2016 tax year; (iv) $2,737, per acre, for the 2018 tax year; (v) $2,788, per acre, for the 2019 tax year; (vi) $2,839, per acre, for the 2020 tax year; and (vii) $2,890, per acre, for the 2021 tax year.

Accordingly, based on the evidence introduced during trial, the court finds that the true or






market value of the subject property's 16,485 acres of unimproved land is: (i) $41,740,000, as of October 1, 2013 ($2,532 x 16,485 acres); (ii) $42,169,000, as of October 1, 2014 ($2,558 x 16,485 acres); (iii) $43,421,000, as of October 1, 2015 ($2,634 x. 16,485 acres); (iv) $45,119,000, as of October 1, 2017 ($2,737 x 16,485 acres); (v) $45,960,000, as of October 1, 2018 ($2,788 x 16,485 acres); (vi) $46,801,000, as of October 1, 2019 ($2,839 x 16,485 acres); and (vii) $47,642,000, as of October 1, 2020 ($2,890 x 16,485 acres).

E.    Corrected Local Property Tax Assessment

Having reached conclusions of the subject property's true or fair market value, the court will turn its attention to determining the subject property's correct assessment for the 2014, 2015, 2016, 2018, 2019, 2020, and 2021 tax years.

Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property. . . ." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b).

For the 2014 tax year, the ratio of assessed value, $35,820,050, to true market value, $41,740,000, yields a ratio of 85.82% ($35,820,050/$41,740,000 = 85.82%), which falls within West Milford's upper limit (100%) and lower limit (78.98%) of the Chapter 123 common level range. Consequently, no increase or reduction in the subject property's tax assessment is warranted for the 2014 tax year.

For the 2015 tax year, the ratio of assessed value, $35,820,050, to true market value,

   

$42,169,000, yields a ratio of 84.94% ($35,820,050/$42,169,000 = 84.94%), which falls within West Milford's upper limit (100%) and lower limit (80.98%) of the Chapter 123 common level range. Consequently, no increase or reduction in the subject property's tax year assessment is warranted for the 2015 tax year.

For the 2016 tax year, the ratio of assessed value, $35,820,050, to true market value, $43,421,000, yields a ratio of 82.50% ($35,820,050/$43,421,000 = 82.50%), which falls within West Milford's upper limit (100%) and lower limit (76.79%) of the Chapter 123 common level range. Consequently, no increase or reduction in the subject property's tax assessment is warranted for the 2016 tax year.

For the 2018 tax year, the ratio of assessed value, $39,138,250, to true market value, $45,119,000, yields a ratio of 86.74% ($39,138,250/$45,119,000 = 86.74%), which falls within West Milford's upper limit (100%) and lower limit (78.16%) of the Chapter 123 common level range. Consequently, no increase or reduction in the subject property's tax assessment is warranted for the 2018 tax year.

For the 2019 tax year, the ratio of assessed value, $39,138,250, to true market value, $45,960,000, yields a ratio of 85.16% ($39,138,250/$45,960,000 = 85.16%), which falls within West Milford's upper limit (100%) and lower limit (77.08%) of the Chapter 123 common level range. Consequently, no increase or reduction in the subject property's tax assessment is warranted for the 2019 tax year.

For the 2020 tax year, the ratio of assessed value, $43,263,400, to true market value, $46,801,000, yields a ratio of 92.44% ($43,263,400$46,801,000 = 92.44%), which falls within West Milford's upper limit (100%) and lower limit (74.27%) of the Chapter 123 common level






range. Consequently, no increase or reduction in the subject property's tax assessment is warranted for the 2020 tax year.

For the 2021 tax year, the ratio of assessed value, $43,263,400, to true market value, $47,642,000, yields a ratio of 90.81% ($43,263,400/$47,642,000 = 90.81%), which falls within West Milford's upper limit (99.75%) and lower limit (73.73%) of the Chapter 123 common level range. Consequently, no increase or reduction in the subject property's tax assessment is warranted for the 2021 tax year.

Accordingly, contemporaneous herewith the court shall enter judgments affirming the subject property's 2014, 2015, 2016, 2018, 2019, 2020, and 2021 tax year assessments.

Very truly yours,

/S/ JUDGE JOSHUA D. NOVIN, J.T.C.

Hon. Joshua D. Novin, J.T.C.




